657 So.2d 1292 (1995)
A. COPELAND ENTERPRISES, INC., et al.,
v.
SLIDELL MEMORIAL HOSPITAL, et al.
No. 94-C-2011.
Supreme Court of Louisiana.
June 30, 1995.
*1293 Charles T. Williams, Jr., Blue Williams, Metairie; John Elliott Baker, Metairie, for applicant.
Margaret Hamersly Kern, Jones, Fussell, Buras, Schoen, Kern & Crain, Covington; Robert Angelle, Metairie, for respondent.
*1294 JOHNSON, Justice[*].
We granted defendant's writ of certiorari to determine whether, under La.R.S. 40:1299.43(C)[1] of the Louisiana Medical Malpractice Act, an employee's health care provider is entitled to reimbursement of future medical expenses through subrogation from the Louisiana Patient's Compensation Fund (PCF) where the employer, through its Health Care Administrators, paid the employee's medical expenses in the amount of $731,602.57 under the employer's health plan. The trial court found that the A. Copeland Enterprises, Inc. and its Employee Welfare Benefits Plan (collectively Copeland) obtained a right of subrogation in favor of Copeland from their employee insured, Donna Wallace, which allowed Copeland to assert the medical expenses claim of the deceased employee and her family. The court of appeal affirmed. It determined that subrogation results in no greater liability to the PCF than would have occurred had the patient asserted the claim herself. Therefore, according to the court of appeal, Copeland could be reimbursed directly from the PCF for medical expenses incurred on behalf of Mrs. Wallace. We disagree and for the reasons assigned, the judgment of the court of appeal is reversed.

FACTS AND PROCEDURAL HISTORY
On July 12, 1988, Donna Wallace underwent a mastectomy at Slidell Memorial Hospital in Slidell, Louisiana. Immediately following the surgery, Mrs. Wallace awakened in the recovery room and complained of pain. Julie Joyce, the nurse anesthetist, injected Mrs. Wallace with a narcotic analgesic for her pain. Shortly thereafter, Mrs. Wallace lapsed into a coma where she remained until her death on August 22, 1990.
On February 16, 1989, Mrs. Wallace and her husband, individually and on behalf of their three minor children, filed a medical malpractice suit, naming Slidell Memorial Hospital, Dr. Luis Hernandez, the anesthesiologist, and Julie Joyce, the nurse anesthetist, among others, as defendants. Pursuant to La.R.S. 40:1299.47,[2] the matter was submitted to a medical malpractice review panel. During the review panel proceedings, Copeland, Mrs. Wallace's employer, intervened seeking reimbursement of medical expenses paid on her behalf. Copeland, through its Health Care Administrators, Travelers Insurance Company and Provident Insurance Company, paid a total of $731,602.57 in medical expenses for Mrs. Wallace's alleged medical malpractice injuries under its employee benefit plan from July 12, 1988 until August 1990, the month of her death.
Sometime in August 1990, the Wallaces settled their medical malpractice claim against the named defendants and received payment from the PCF in the amount of $500,000.00, plus legal interest, along with other medical expenses incurred after the date of settlement. The receipt and release agreement specifically stated that the settlement "represents general damages only and does not include any amount as compensation for medical expenses incurred prior to the date of Judgment authorizing and approving this settlement." In addition, the receipt and release agreement provided that PCF
will indemnify, protect and hold harmless Charles Wallace ... from all liability ..., from any and all claims ... which has been or may ever be asserted by A. Copeland Enterprises, Inc., ... concerning the terms and conditions of any ERISA plan and/or subrogation rights, or reimbursements,... and all related issues raised thereby and/or by the "subrogation recovery agreement" dated July 19, 1988....
(emphasis in original).
The "subrogation recovery agreement" executed by Charles Wallace on behalf of his *1295 wife, Donna Wallace, on July 19, 1988, provided as follows:

SUBROGATION RECOVERY AGREEMENT
In order for our claims department to process any charges incurred in connection with your recent accident, we must have this statement signed by you, The Eligible Covered Employee.
This agreement will allow payment for benefits under the A. Copeland Entp., Inc. plan based on the understanding that any money collected from a Third Party for the same expenses will be returned to A. Copeland Enterprises, Inc.

AGREEMENT
If I, Donna G. Wallace recover money from a Third Party for negligently injuring me, I agree to reimburse A. Copeland Entp., Inc. any money it has paid for such injuries.
I also agree to supply any information or assistance asked by the claims department which it needs to enforce the Plan's recovery rights.
Copeland filed suit against Slidell Memorial Hospital and its insured, the Louisiana Hospital Association Trust Fund, Dr. Hernandez, Julie Joyce, C.R.N.A., and the PCF on April 9, 1991, seeking reimbursement of medical expenses paid under Copeland's employee benefit plan on behalf of Mrs. Wallace. The Louisiana Hospital Association Fund and Dr. Hernandez were later dismissed from this litigation. During the trial of this matter, the parties agreed to stipulate to the following pertinent uncontested facts:
1) the qualified health-care provider status of two defendants, Slidell Memorial Hospital and Julie Joyce;
2) the liability of Slidell Memorial Hospital and Julie Joyce;
3) the payment of Mrs. Wallace's medical expenses in the amount of $731,602.57 by Travelers Insurance Company and Provident Insurance Company from money funded by A. Copeland Enterprises, Inc.;
4) that coverage for medical expenses was provided to Mrs. Wallace under the A. Copeland Enterprises Employee Benefit Plan;
5) that Mr. Wallace executed a subrogation agreement in favor of Copeland in regard to the medical payments; and
6) the authenticity of certain depositions and documents.
The parties submitted their legal arguments on briefs for the trial court's determination.
The sole issue before the lower courts was whether Copeland, as subrogee of Mrs. Wallace, was entitled to reimbursement of medical expenses directly from the PCF.
The trial court, relying on Lamark v. NME Hospitals, Inc., 522 So.2d 634 (La.App. 4 Cir.1988),[3] found that Copeland had been subrogated to assert its claim against the PCF for the stipulated medical expenses paid by Copeland on behalf of Donna Wallace. Accordingly, the trial court rendered judgment in favor of Copeland and against Slidell Memorial Hospital and Julie Joyce, C.R.N.A., as nominal defendants, and the PCF for $731,602.57, plus legal interest from August 22, 1990, as stipulated by the parties.
The court of appeal affirmed. 637 So.2d 1087 (La.App. 1st Cir.1994). It held that the Louisiana Medical Malpractice Act, La.R.S. 40:1299.43(C), which allows a patient who has settled a medical malpractice action to make a claim to the PCF for future medical care *1296 and related benefits,[4] would also permit recovery by the patient's self-insured employer as the patient's subrogee.
We granted the PCF's application for certiorari, 94-C-2011, 644 So.2d 661 (La.1994), to determine whether Copeland is entitled to reimbursement through subrogation directly from the Patient's Compensation Fund for medical expenses paid on behalf of the patient under its employee benefit plan.

LAW AND DISCUSSION

I. LEGAL SUBROGATION
The PCF argues that the "subrogation recovery agreement" between Mrs. Wallace and Copeland does not allow Copeland to recover money directly from the PCF. Relying on Martin v. Louisiana Farm Bureau Casualty Insurance Company, 94-C-0069, 638 So.2d 1067 (La.1994), the PCF argues that legal subrogation, pursuant to La.C.C. art. 1829, does not occur in favor of a health insurer simply because the insurer has paid the medical expenses of an insured.
Subrogation is the substitution of one person to the rights of another. La.C.C. art. 1825. When subrogation results from a person's performance of the obligation of another, that obligation subsists in favor of the person who performed it, who may avail himself of the action and security of the original obligee against the obligor, but is extinguished for the original obligee. An original obligee who has been paid only in part may exercise his rights for the balance of the debt in preference to the new obligee. La.C.C. art. 1826.
In other words, subrogation is the legal fiction established by law whereby an obligation, extinguished with regard to the original creditor by payment which he has received from a third person, or from the original debtor but with funds that a third person has provided, is regarded as substituting in favor of this third person who in essence steps into the shoes of the original debtor and is entitled to assert, in the measure of what he has paid, the rights and actions of the former creditor. 4 C. Aubry & C. Rau, Droit Civil Francais § 321 (6th ed. Bartin) in A. Yiannopoulos, 1 Civil Law Translations 187 (1965). See also 2 M. Planiol, Civil Law Treatise pt. 1, nos. 474, 475 at 271 (11th ed. La.St.L.Inst. trans.1959); Comment, The Role of Subrogation by Operation of Law and Related Problems in the Insurance Field, 22 La.L.Rev. 225 (1961); Comment, Fundamental Principles and Effects of Subrogation in French and Louisiana Law, 25 Tul.L.Rev. 358 (1951). Subrogation thus gives an advantage to the third person by assuring him of reimbursement in a way considerably more effective than the personal action that arises from just his act of performing. Litvinoff, The Law of Obligations 5, § 11.2 (1992); See 7 Planoil et Ripert, Traite pratique de droit civil francais 626 (2d ed. 1954).
Subrogation, as a manner of effecting a transfer of an obligation at the time a creditor received payment from a person other than his principal or original obligor, originated from two Roman law institutions. See Buckland, A Text Book of Roman Law From Augustus to Justinian 449 and 565 (2d ed. 1950). Article 2161 of the Louisiana Civil Code of 1870, is virtually identical to the corresponding article of the French Civil Code. Titles III and IV of Book III of the Civil Code of 1870, which formerly contained C.C. arts. 1756 to 2291, all relative to Obligations, were amended and reenacted by Acts 1984, No. 331, to contain C.C. arts. 1756 to 2057, effective January 1, 1985. Although not absolutely binding, this Court has given great persuasive weight to comments of French authors interpreting articles adopted from the French Civil Code. Orleans Parish Sch. Bd. v. Pittman Construction Co., 261 La. 665, 260 So.2d 661 (1972); Rials v. Davis, 212 La. 161, 31 So.2d 726 (La.1947).
*1297 In essence, subrogation is a contract between the creditor and the person who renders performance. It is subject to the general rules that govern the proof of obligations. See 2 Planiol & Ripert Traite Elemenntaire de Droit Civil, p. 1. no. 480, at 274 (11th ed. La.St.L.Inst. trans.1959). Subrogation may be either conventional or legal. La.C.C. art. 1825. It may result from either the agreement of the obligor or the obligee or both with a third person, or directly from the operation of law. Thus, the intention of subrogation is to protect such persons who perform certain acts. Litvinoff, The Law of Obligations, § 11.8 (1992).
In Martin, supra, this Court addressed the issue of whether a health and accident insurer, which pays its insured's medical expenses after an automobile accident, is entitled to legal subrogation against a tortfeasor. We concluded that a health and accident insurer is not "bound with ... or for" a tortfeasor whose actions give rise to medical expenses. Therefore, the insurer does not become legally subrogated to its insured's cause of action simply by making the medical payments called for in its insurance contract. In reaching this decision, we examined La. C.C. art. 1829 which provides:
Subrogation takes place by operation of law:
* * * * * *
(3) In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment.
We determined that under article 1829(3), the initial inquiry is whether the obligor is bound "with ... or for others," and in order for an obligor to be bound, the obligation must be solidary and indivisible. An obligation is solidary among debtors when they are obliged to do the same thing, so that either may be compelled to perform the whole obligation, and payment by one exonerates the other. La.C.C. art. 1794; Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982).
Solidary liability is never presumed and arises only from a clear expression of the parties' intent or from law. La.C.C. art. 1796. Consequently, an insurer bound to repair the damage caused by a tortfeasor is solidarily liable with the tortfeasor because both are obligated to the same thing, repair of the tort damage. Fertitta v. Allstate Ins. Co., 462 So.2d 159 (La.1985). See La.R.S. 22:1406(D)(1)(a); La.R.S. 22:655(B)(1).
On the other hand, medical insurers are not obligated to repair tort damages. A medical insurer contracts to pay stipulated medical expenses, regardless of whether there is a tortfeasor and tort liability. The medical insurer thus pays its own debt, not that of the tortfeasor, and the two are not obligated to "the same thing." See Fertitta, 462 So.2d at 164, n. 7; 2 Planiol & Ripert, Traite Elemenntaire de Droit Civil, p. 1. no. 491 n. 27, at 278 (La.St.L.Inst. trans. 11th ed. 1959). We also recognized that Article 1829(3) is an exception to the general rule that subrogation does not take place when a third person pays the debt of another. La. C.C. art. 1855 states the general rule that "performance rendered by a third person effects subrogation only when so provided by law or agreement."
Hence, based on this court's analysis in Martin, Copeland, who is neither "bound with ... or for" the tortfeasors' actions does not become legally subrogated to the rights of Mrs. Wallace simply by making medical payments on her behalf.

II. CONVENTIONAL SUBROGATION
Copeland argues that the instant case is distinguishable from Martin, supra, in that there is a distinct "subrogation recovery agreement" between it and the Wallaces. Copeland maintains that by agreement the Wallaces conventionally subrogated their rights to Copeland. Copeland further argues that the express language in the receipt and release agreement clearly indicates that the Wallaces did not receive any compensation from the tortfeasors representing medical expenses and the right to recover such expenses *1298 was reserved to it. In sum, Copeland contends that because it was conventionally subrogated to the rights of the Wallaces, it is entitled to reimbursement for all medical expenses incurred on behalf of Mrs. Wallace.
Conventional subrogation occurs when an obligee, who receives performance from a third person, subrogates that person to his rights, even without the obligor's consent. La.C.C. art. 1827. In conventional subrogation, an obligee who receives performance from a third person may subrogate that person to the rights of the obligee, even without the obligor's consent. La.C.C. art. 1827. The third person or conventional subrogee is now substituted to all the rights of the original obligee. The third person, or subrogee, is entitled to recover the full amount of the debt from the obligor regardless of the amount he paid to the obligee. See comment (d) of La.C.C. art 1827.
The obligee, by subrogating his rights to a third person from whom he receives performance, may obtain the advantage of receiving that performance at a moment when the original obligor might have difficulty rendering it. Moreover, unless the obligation is strictly personal, the obligor suffers no damage to his interest by the original obligee substituting his rights to a third party. Litvinoff, The Law of Obligations 5, § 11.21 (1992).
Although the obligor's consent is not required for subrogation by the obligee, the obligee's intention to subrogate must be clearly indicated. Pursuant to article 1827, the agreement for subrogation need not be in writing. The agreement may be oral or an express written agreement between the obligee and the third person. That being the case, prior decisions holding that conventional subrogation by the obligee must be in writing and before the time of payment have been expressly overruled. See Succession of Virgin, 18 La.Ann. 42 (1866); Bank of Bienville v. Fidelity & Deposit Co. of Maryland, 172 La. 687, 135 So. 26 (1931); Cooper v. Jennings Refining Co., 118 La. 181, 42 So. 766 (1907); Cox v. W.M. Heroman & Co., Inc., 298 So.2d 848 (La.1974).
Nonetheless, if subrogation is disputed, the obligee's intention must be shown by clear proof of acts of the obligee that unquestionably implies it. Litvinoff, The Law of Subrogation 5, § 11.22 (1992). Louisiana jurisprudence has held that an agreement of subrogation by the obligee may be proved by parol evidence. See Litvinoff, The Law of Subrogation 5, § 11.23 n. 3. However, an act under private signature is regarded prima facie as the true and genuine act of a party executing it when his signature has been acknowledged, and the act shall be admitted into evidence without further proof. La.C.C. art. 1836. Therefore, absent such circumstances as a vice of consent, a simulation, or proof that a written act was modified by a subsequent and valid oral agreement, testimonial or other evidence may not be admitted to negate or vary the contents of an act under private signature. La.C.C. art. 1848.
In urging that there is no conventional subrogation, the PCF argues that the "subrogation recovery agreement" when considered alone and in the context of other agreements clearly constitutes a reimbursement agreement, not a "true subrogation agreement."
To determine whether the agreement entitled "subrogation recovery agreement" between Copeland and Mr. Wallace actually denotes a true conventional subrogation, we must first examine the wording of the agreement. The clear wording of the "subrogation recovery agreement" mirrors that of a reimbursement agreement. In other words, the agreement permits Copeland to be reimbursed directly from the Wallaces any money it has paid on behalf of Mrs. Wallace only if the Wallaces recover money from a negligent third party for the same injuries.
While subrogation and reimbursement are similar in effect, they are different principles. With subrogation, the insurer stands in the shoes of the insured, whereas with reimbursement, the insurer has a direct *1299 right of repayment against the insured. Thus, the agreement, although entitled "subrogation recovery agreement" does not conventionally subrogate Copeland to the Wallaces' rights against the tortfeasor, it only affords Copeland the right of repayment from the insured. That is, the language of the agreement never permits Copeland to recover money directly from the third party. For these reasons, we conclude that based on the clear language of the "subrogation recovery agreement", Copeland is not conventionally subrogated to the Wallaces' rights against the negligent third party.
Further, in regard to the indemnity agreement contained in the release and receipt agreement, we conclude the agreement merely attempts to protect the Wallaces from any and all liability in connection with any claims which may be asserted against them by Copeland regarding reimbursement of medical expenses incurred on behalf of Mrs. Wallace. The mere acknowledgment of the "subrogation recovery agreement" in the indemnity clause does not, in and of itself, grant Copeland a right of subrogation.

III. LEGISLATIVE INTENT
Next, PCF asserts that the clear and unambiguous language of La.R.S. 40:1299.43(C) grants the right to recover future medical care and related benefits from the PCF only to the "patient". It argues that § 1299.41(A)(3) specifically defines "patient" as "a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied." (emphasis added). PCF thus contends that the clear reading of the statute precludes Copeland, who is neither the patient nor a natural person, from recovering through subrogation the $731,602.57 in medical expenses paid on behalf of Ms. Wallace. In addition, PCF, citing Ramirez v. Fair Grounds Corporation, 575 So.2d 811 (La.1991), argues that because the law is clear and unambiguous, it should be applied as written and no further interpretation may be made in search of the intent of the Legislature.
The purpose of the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41 et seq., is to provide compensation to medical malpractice victims who have been injured by qualified health care providers. Stuka v. Fleming, 561 So.2d 1371 (La.1990), cert. denied, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990). The Act creates a Patient's Compensation Fund which pays general damages to medical malpractice victims in excess of the $100,000.00 limitation, but not more than $500,000.00, plus interest and costs.[5] In addition to any judgment in favor of medical malpractice victims, under Section 1299:43(C) of the Act, the PCF also provides coverage for all reasonable future medical care and related benefits for the medical malpractice victims.
La.R.S. 40:1299.43(C) provides:
Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits or a settlement is reached between a patient and the patient's compensation fund in which the provision of medical care and related benefits is agreed upon and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the patient's compensation fund through the board for all future medical care and related benefits directly or indirectly made necessary by the health care provider's malpractice unless the patient refuses to allow them to be furnished.
Although proper interpretation and application of this statute would compel this Court to examine the Legislative intent, we pretermit resolving whether a non-patient, through subrogation, may assert a claim directly *1300 against the PCF for future medical expenses because, for the following reasons, this Court concludes that it lacks subject matter jurisdiction is these proceedings.

IV. ERISA
The PCF contends that because a provision in Copeland's Benefit Plan specifically provides that the plan is not a contract between Copeland and its employees, under state law, the subrogation provision cannot be construed to create an enforceable conventional subrogation in favor of Copeland.
The subrogation provision in Copeland's benefit plan contained the following clause:

SUBROGATION
If a Covered Employee ... recovers money from a third party for negligently injuring the Covered Employee ..., and if the Plan has paid any money for such injuries, then the Employee agrees to reimburse the Plan from any money he recovers from such third party. The Plan also has the right, in the Employee's place, to sue such third party to recover any money it has paid for such injuries.
(emphasis added.)
The provision in Copeland's benefit plan entitled "General Provisions" upon which the PCF relies provided that "[t]he Plan shall not be deemed to constitute a contract between the Company and any employee or to a consideration for, or an inducement or condition of, the employment of any employee."
Copeland maintains that the subrogation provision alone conventionally subrogates it to the Wallaces' rights. In addition, Copeland argues that the plan is not a contract, but a self-insured ERISA plan governed by federal law.[6] Copeland contends that pursuant to 29 U.S.C. Section 1001, et seq., federal law supersedes any and all state laws that relate to ERISA plans. Copeland thus argues that despite the general provision in the plan, the subrogation provision creates a true subrogation between it and the Wallaces. It further argues that despite state laws to the contrary, federal courts have consistently upheld such provisions in ERISA plans as valid and enforceable.
The federal Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq. (ERISA), inclusively regulates employee pension and welfare plans. Pursuant to 29 U.S.C. § 1002(1), an employee welfare benefit plan is defined as
"any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such a plan, fund, or program was established or is maintained for the purposes of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment ..."
"Plans may self-insure or they may purchase insurance for their participants. Plans that purchase insuranceso called `insured plans'are directly affected by state laws that regulate the insurance industry." Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985). The statute imposes participation, funding and vesting requirements on pension plans and sets uniform *1301 standards, including rules concerning reporting, disclosure and fiduciary responsibilities, for both pension and welfare plans. Thus, "the purpose of ERISA was `to promote the interest of employees and their beneficiaries in employee benefit plans,' Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), and `to protect contractually defined benefits,' Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. [134] at 148, 105 S.Ct. [3085] at 3093 [87 L.Ed.2d 96 (1985)]." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989).
The provisions of ERISA relating to pre-emption include the pre-emption clause in § 1144(a),[7] the saving clause in § 1144(b)(2)(A),[8] and the deemer clause in § 1144(b)(2)(B).[9] In essence, state laws which relate to employee benefit plans are pre-empted by ERISA except for those state laws that regulate insurance. Moreover, a state law that purports to regulate insurance cannot deem an employee benefit plan to be an insurance company. See Soniat v. Travelers Ins. Co., 538 So.2d 210 (La.1989). "While the purpose of ERISA pre-emption is to provide uniform application to benefits claims under ERISA-regulated plans, Congress apparently intended by enacting the saving clause to leave regulation of the insurance industry to the states." Soniat, supra, at 213.
Nevertheless, under ERISA, Congress explicitly set forth provisions granting federal district courts exclusive jurisdiction in civil actions brought by fiduciaries attempting to enforce the terms of a benefit plan. 29 U.S.C. § 1132(a)(3)(B)(ii). The standing provisions of ERISA must be construed narrowly, limiting civil actions under the Act to those parties and actions specifically enumerated in the Act by Congress. See Gulf Life Ins. Co. v. Arnold, 809 F.2d 1520 (11th Cir.1987); Lifetime Medical Nursing Services, Inc. v. New England Health Care Employees Welfare Fund, 730 F.Supp. 1192 (D.R.I.1990).
Section § 1132 entitled "[c]ivil enforcement" provides in pertinent part:

(a) Persons empowered to bring a civil action
A civil action may be brought
(1) by a participant or beneficiary
* * * * * *
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan;
* * * * * *
(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; (emphasis added.)
* * * * * *
(7) by a State to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title);

*1302 (e) Jurisdiction
(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary ... State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a). (emphasis added)

* * * * * *
Congress specifically bestowed upon state courts concurrent jurisdiction in matters arising under 29 U.S.C. § 1132(a)(1)(B) and (7). That being the case, we, construing § 1132 narrowly, interpret this section to mean that a participant or a beneficiary may bring an action in either state or federal court to 1) recover benefits due to him; 2) enforce his rights; and 3) clarify his rights to future benefits, under the terms of the plan. Also under paragraph seven (7) of subsection (a) of this section, a State may seek relief in state court to enforce compliance with a qualified medical child support order. (emphasis added). Here, Copeland is neither the proper party (a participant, beneficiary or State) to bring an action in this Court under ERISA, nor is this action one that falls within the scope of this Court's concurrent jurisdiction. Copeland is the fiduciary seeking to enforce a subrogation right under the terms of its employee benefit plan. It is apparent that this action is not within the realm of this Court's concurrent jurisdiction as enumerated by the Act. Thus, based upon the clear wording of section 1132, the federal district court would have exclusive subject matter jurisdiction to determine whether Copeland is entitled to reimbursement pursuant to a subrogation agreement.

CONCLUSION
Pursuant to 29 U.S.C. § 1132 this Court is without jurisdiction to determine the merits of the issues herein. Accordingly, the prior court judgments purporting to adjudicate the challenged claims are invalid and for the above assigned reasons, we reverse the judgments of both the court of appeal and district court.
REVERSED.
VICTORY, J., concurs.
DENNIS, J., concurs with reasons.
CALOGERO, C.J., concurs and assigns reasons.
DENNIS, Justice, concurring.
I respectfully concur in the result, but do not join the majority's opinion. The district court judgment is null and void because that court lacks subject matter jurisdiction to adjudicate the question of whether Copeland or any other person is entitled to collect future medical expenses reimbursements from the PCF. La.C.Civ.P. Arts. 2 & 3. Under the Medical Malpractice Act, the legislature eliminated all judicial power in initial decision making or supervision over future medical and related care claims and vested such exclusive jurisdiction in the Patient's Compensation Fund Oversight Board. La.R.S. 40:1299.43, subds. A, C, E(2), G(5); 40:1299.44, subd. A(2-4, 7); Kelty v. Brumfield, 633 So.2d 1210 (La.1994). Jurisdiction over the subject matter is the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted. La.C.Civ.P. Art. 2. The jurisdiction of a court over the subject matter of an action or proceeding cannot be conferred by consent of the parties. A judgment rendered by a court which has no jurisdiction over the subject matter of the action or proceeding is void. Id., Art. 3. When jurisdiction over the subject matter is lacking, this court is bound ex officio to notice it, and declare the judgment of a lower court wanting such jurisdiction null for that reason. Herbert v. Regan, 522 So.2d 1157 (La.App. 4th Cir.), writ denied 523 So.2d 1312 (La.) *1303 reconsideration denied 526 So.2d 806 (La. 1988); Fleming v. Hiligsberg, 11 Rob. 77 (La.1845); Grenier v. Thielen, 6 Rob. 365 (La.1844); Kerr v. Kerr, 14 La. 177 (1839); Dupey v. Greffin's Executor, 1 Mart. (n.s.) 200 (La.1823); Lafon's Ex'rs v. Lafon, 1 Mart. (n.s.) 703 (La.1823). Consequently, it is unnecessary for this court to reach any federal law question in this case. Greater judicial efficiency and coherence are promoted when we address state law issues first. See State v. Perry, 610 So.2d 746 (La.1992).
CALOGERO, Chief Justice, concurring.
I take note of Justice Dennis' concurrence where he posits a convincing argument that under the Medical Malpractice Act, only the Patient's Compensation Fund ("PCF") Oversight Board has jurisdiction over future medical and related care claims, citing our opinion in Kelty v. Brumfield, 633 So.2d 1210 (La.1994), a decision in which I joined. While the Kelty decision may well be dicta as the majority opinion resolves this case, I would prefer to have the opinion discuss Kelty for the benefit of the federal court which might soon be reviewing this case in light of the majority conclusion that the federal district court has exclusive jurisdiction over this matter under the federal ERISA statute.
But I part company with my brother Justice's concurrence when it concludes that the trial court judgment was null and void for lack of jurisdiction [because only the PCF Oversight Board has jurisdiction over the claims raised]. In this regard, I agree with the majority opinion although I concur in order to address more fully the application of ERISA.
While it is true that a primary issue in this matter is whether Copeland has a valid claim against the PCF, and which court has jurisdiction to resolve that issue, it must first be determined whether Copeland has been properly subrogated to the employee/patient's rights to assert a claim against the PCF. It is a little like the adage, which came first, the chicken or the egg. In this case, what need we address first, the proper court with jurisdiction over the claim against the PCF, or whether Copeland has standing to bring the claim in the first place? Justice Dennis addresses the former question first, and concludes that the district court judgment was null and void because the court lacked subject matter jurisdiction to adjudicate the question of whether Copeland or any other person is entitled to collect future medical expenses reimbursements from the PCF. While not addressing ERISA's application because in his view greater judicial efficiency and coherence are promoted when we address state law issues first, Justice Dennis does agree that the district court and court of appeal judgments should be reversed. Hence, he concurred in the majority opinion.
In contrast to that approach, I believe we should address the latter question first and examine whether Copeland has any right of subrogation so as to permit assertion of the employee/patient's rights under the employee welfare benefit plan ("Plan"). This was the approach taken in the majority opinion.
Turning to the majority opinion, I agree with the ultimate conclusion that the issue of Copeland's right of subrogation is a matter to be decided under the federal ERISA statute, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., and that we are thus without jurisdiction to decide this issue. But before reaching this conclusion, because it is within our power and is in fact our duty, we should examine the state laws at issue to determine whether they are specifically preempted by ERISA. This examination is necessary because exceptions do exist to ERISA's broad preemptive effect, such as we determined in Soniat v. Travelers Ins. Co., 538 So.2d 210 (La.1989).[1] As will be shown below, the conclusion of such an examination is that ERISA does in fact preempt the particular state laws at *1304 issue in this case. Under ERISA, the federal district court has exclusive jurisdiction over claims brought by a fiduciary to enforce the Plan, and hence state courts are without jurisdiction to proceed.
The federal ERISA statute comprehensively regulates employee pension and welfare benefit plans. As we noted in Cramer v. Association Life Ins. Co., 569 So.2d 533 (La. 1990), ERISA contains an extensive civil enforcement scheme, and Congress specifically provided that the civil enforcement provisions of ERISA would preempt state law under certain conditions.
ERISA's preemption clause is far-reaching and is "conspicuous for its breadth".[2]FMC Corporation v. Holliday, 498 U.S. 52, 56, 111 S.Ct. 403, 406, 112 L.Ed.2d 356 (1990). A state law is preempted by ERISA if it meets three tests: (1) it "relates to" an employee welfare benefit plan; (2) it is not "saved" from preemption;[3] and (3) an employee welfare benefit plan is not "deemed" to be in the business of insurance for purposes of state insurance regulatory laws.[4]Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); FMC Corporation, supra. We now apply these tests to the case before us.

A. Does state law "relate to" the Plan?:
Our first inquiry to determine if ERISA preemption applies in the instant case is whether the state laws at issue "relate to" the Plan. If under the law, Copeland has a right to assert the insured employee's rights under the Plan against the PCF, i.e., if Copeland has been "subrogated" to the insured employee's rights, such rights are only determined after an examination of applicable state law. In this case, Copeland's subrogation rights may emanate from several sources: Louisiana statutory or jurisprudential law on subrogation whether conventional or legal, Louisiana principles of contract interpretation, or rights given directly to Copeland under the terms of the Plan. Copeland's relationship with the insured employee Donna Wallace stems from Wallace's status as an employee and her participation in her employer-sponsored Plan which provided health insurance coverage. Any right that Copeland may have acquired from Wallace is the result of Wallace's participation in the Plan because the Plan was the source of Wallace's health insurance benefits. Therefore, application of any state law to determine the extent of Copeland's acquired subrogation rights must logically "relate to" the Plan, whether the rights arise directly from language in Plan documents or in written agreements entered into after Wallace's claim for health insurance benefits arose.

B. Is state law "saved" from preemption?:
The second preemption inquiry is whether the state laws at issue which relate to the Plan "regulate insurance", thus falling within the "savings clause", and thus exempt from ERISA's preemptive effect (if the "deemer clause" does not apply). Cramer, supra, Pilot Life, supra. In Pilot Life, the Supreme Court utilized three criteria to determine *1305 whether a particular practice falls under the "business of insurance", as that phrase is used in the McCarran-Ferguson Act, so that it regulates insurance: first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry. 481 U.S. at 48-49, 107 S.Ct. at 1553. We expounded upon the meaning of these criteria in Cramer v. Association Life Ins. Co., supra, at 537:
The insurer-insured relationship is defined in the substantive provisions of the insurance contract, and consists of the respective obligations of each party to the contract....
... As we appreciate the use of the term "spreading of risk" in the context of an insurance policy, the risk focused upon is that risk for which the insurance company has specifically contracted to reimburse its insured.... Thus, when looking to see if a particular practice acts to "spread the risk," we must focus on the actual risks that were transferred from the insured to the insurer and determine if the practice acts to alter the contractual apportionment of those risks.
Not all of these factors are met as applied to Louisiana state law on subrogation. While subrogation may not transfer or spread a policyholder's risk, it can be an integral part of the policy relationship between the insurer and the insured. However, it is not limited to entities within the insurance industry. Thus, state laws on subrogation arguably do not "regulate insurance" and are not saved from ERISA's preemption.[5]

C. Is the Plan "deemed" to be an insurance company?:
Even if subrogation laws were state laws that regulated insurance, our inquiry would not end. We must consider the application of the deemer clause, which prohibits employee benefit plans from being "deemed" to be in the business of insurance and subject to state insurance regulations. Federal courts have consistently held that, by virtue of the deemer clause, state laws purporting to regulate insurance may not apply to self-funded employee benefit plans. See, e.g., Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Therefore, as the Copeland Plan is self-funded, state laws purporting to regulate insurance are not applicable.
We also note that federal courts have consistently concluded that state subrogation laws must bow to ERISA: "Application of differing state subrogation laws to plan providers throughout the United States would frustrate ERISA's uniform treatment of benefit plans." Baxter by and through Baxter v. Lynn, 886 F.2d 182, 186 (8th Cir.1989). (See also FMC Corporation v. Holliday, supra, where the Supreme Court held that provisions of Pennsylvania's Motor Vehicle Financial Responsibility Law which precluded subrogation were preempted by ERISA; and Electro-Mechanical Corporation v. Ogan, 9 F.3d 445 (6th Cir.1993), where the Sixth Circuit concluded that ERISA preempted the Tennessee Medical Malpractice Act to the extent that it prevented a self-funded health plan from seeking to recover costs of a plan participant's expenses from settlement proceeds.)
As our analysis reveals that subrogation laws are preempted by ERISA, the discussion *1306 of Louisiana law on legal or conventional subrogation in the majority opinion is unnecessary because those laws have been preempted by federal law. The application of our Civil Code articles on conventional or legal subrogation to the facts before us is inappropriate because whether a Plan is properly subrogated to a participant's rights is an issue within the exclusive purview of ERISA.
After concluding that the state laws at issue are preempted by ERISA, we then proceed to determine whether we have jurisdiction to apply the federal law of ERISA. The majority concludes that we do not, because this is not a claim by a participant or a beneficiary to recover benefits or enforce or clarify rights under the Plan, which are the only claims over which state courts have jurisdiction concurrent with federal district courts. I agree with this conclusion, noting that the United States Fifth Circuit in Hermann Hospital v. MEBA Medical and Benefits Plan, 959 F.2d 569 (5th Cir.1992) refused to consider a hospital which was the assignee of the patient's rights to receive payment under his Plan as a "beneficiary" for purposes of ERISA.
In conclusion, I agree with my brother Justice's concurrence that our decision in Kelty, supra, should have been discussed in the majority opinion, in my view to provide clarification to a federal district court in the event this matter is filed in that jurisdiction. Further, I agree with the majority's ultimate conclusion that this matter is preempted by ERISA, and under ERISA federal district courts have exclusive jurisdiction over a claim such as that brought by Copeland against the PCF. I believe that such conclusion is buttressed by this analysis of the applicable state laws and ERISA's preemptive effect upon those laws. Having performed the preemption analysis, I conclude that the state laws raised here are indeed preempted and thus, under ERISA, state courts are without jurisdiction to adjudicate this claim. Therefore, I respectfully concur.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Lemmon, J. was not on the panel which heard and decided this case.
[1] See infra.
[2] § 1299.47 provides in pertinent part that "[a]ll malpractice claims against health care providers covered by this Part, other than claims validly agreed for submission to a lawfully binding arbitration procedure, shall be reviewed by a medical review panel established as hereinafter provided for in this Section."
[3] On supervisory review, the appellate court in Lamark affirmed the trial court's order, directing the Commissioner to pay the family members of an interdict patient past and future medical expenses.

However, as argued by the Fund, Lamark is not on point with the instant case in that future medical benefits were sought under R.S. 40:1299.43(C) by the husband of the medical malpractice victim as curator of his incapacitated wife.
[4] La.R.S. 40:1299.43 B(1) provides that "`[f]uture medical care and related benefits' for the purpose of this Section means all reasonable medical, surgical, hospitalization, ... reasonably necessary ... after the date of the injury."
[5] § 1299.42 B(1) limits the total amount recoverable to $500,000.00, plus interest and costs for all malpractice claims for injuries to or death of a patient.

§ 1299.42 B(2) limits the liability of a health care provider to $100,000.00, plus interest for all malpractice claims because of injuries to or death of any patient.
[6] It is undisputed that the A. Copeland Employee Welfare Benefit Plan is an ERISA plan governed by 29 U.S.C. 1001, et seq. Copeland alleged in paragraph No. 5 of its original petition that "[t]he A. Copeland Enterprises, Inc. Employee Welfare Benefits plan, one of the petitioners herein, was an ERISA Plan instituted, funded and maintained, by A. Copeland Enterprises, Inc., d/b/a Popeyes Famous Fried Chicken and Biscuits."

Further, the parties stipulated that coverage was provided under Copeland's employee benefit plan and the payment of Mrs. Wallace's medical expenses was from money funded by A. Copeland Enterprises, Inc. In addition, PCF acknowledged the ERISA plan in the receipt and release agreement. See Facts and Procedural History, supra.
[7] § 1144(a) provides that "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..."
[8] § 1144(b)(2)(A), the saving clause, provides that "[e]xcept as provided in subparagraph (B), nothing in this chapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."
[9] § 1144(b)(2)(B), the deemer clause provides that "[n]either an employee benefit plan ... nor any trust established under such plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies."
[1] In Soniat, supra, we concluded that La.R.S. 22:213B(7), which prohibits an insurer from cancelling a policy under certain conditions, was not preempted by ERISA because it was a statute that regulated insurance, thus being saved from ERISA preemption, as explained further below.
[2] ERISA's preemption clause, 29 U.S.C. § 1144(a), states in pertinent part:

Except as provided in subsection (b) of this section [the savings clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ... (emphasis added).
[3] The savings clause, 29 U.S.C. § 1144(b)(2)(A), states in pertinent part:

Except as provided in subparagraph (B) [the deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities. (emphasis added).
[4] The deemer clause, 29 U.S.C. § 1144(b)(2)(B), states in pertinent part:

Neither an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer ... or to be engaged in the business of insurance for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, ... (emphasis added).
[5] Conversely, the majority in Cramer concluded that La.R.S. 22:657, which provides for mandatory attorney's fees and penalties in cases where an insurance company arbitrarily fails to pay benefits, was preempted by ERISA. The statute was not saved from preemption because it was not a state law that regulated insurance. The author of this concurrence dissented from this conclusion in that case because in his opinion, La.R.S. 22:657 clearly regulated the business of insurance. The statute was specifically directed at regulating the duties of an insurer in any health and accident contract. Further, the statute affected an integral part of the insurer-insured relationship because timely payment of a claim is the central obligation of an insurance contract. La.R.S. 22:657, located in the Louisiana Insurance Code, imposes a duty on the insurer to pay a claim within a certain time and establishes a penalty for breaching that obligation.