# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-0563

**RANDY ALVIS AND E. G. ALVIS**

**VERSUS**

**CIT GROUP/EQUIPMENT FINANCING, INC., ET AL.**

************

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT,
PARISH OF SABINE, NO. 55,948,
HONORABLE ROBERT E. BURGESS, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**C. R. Whitehead, Jr.**
**Whitehead Law Offices**
**Post Office Box 697**
**Natchitoches, LA  71458**
**(318) 352-6481**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Randy Alvis and E. G. Alvis**

**William D. Dyess**
**The Dyess Law Firm**
**Post Office Box 967**
**Natchitoches, LA  71457**
**(318) 352-5880**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Byles Welding & Tractor Co., Inc. and Clauriste T. Byles, Sr.**

PETERS, J.

Randy Alvis and his father, E.G. Alvis (sometimes hereinafter referred to collectively as "the plaintiffs"), brought suit against Byles Welding & Tractor Co., Inc. and Clauriste T. Byles, Sr. (sometimes hereinafter referred to collectively as "the defendants"), seeking to rescind a contract involving the transfer of a log skidder, to recover the value of a trade-in skidder, and to recover attorney fees. After trial, the trial court rejected their demands, and the plaintiffs have appealed. For the following reasons, we affirm the trial court judgment.

### DISCUSSION OF THE RECORD

Clauriste T. Byles, Sr. (Clauriste) is the owner of Byles Welding & Tractor Co., Inc. (Byles Welding), a corporation which sells wood-hauling equipment to the public from its Many, Louisiana business location. Randy Alvis (Randy) resides in east Texas and is in the timber harvesting business. Randy's father, E. G. Alvis (E. G.), raises cattle and hay in east Texas. This litigation arises from an attempt by Randy to purchase a 1997 H67H log skidder from Byles Welding. The skidder was manufactured by Allied Systems Company (Allied Systems) of Sherwood, Oregon.

Most of the pertinent facts in this litigation are not contested. In 1997, Byles Welding had a distributer agreement with Allied Systems and, in that year, accepted delivery of four newly manufactured H67H skidders. After modifying and updating all four skidders, Byles Welding quickly sold three of the units. However, the remaining skidder continued to experience various problems which affected its operation. Byles Welding replaced a number of major components in an effort to resolve the problems, but, despite these efforts, the skidder's performance remained unsatisfactory. In January of 2000, Byles Welding filed a suit in redhibition against

Allied Systems, listing seventeen defects it claimed to have discovered since the original acquisition.

For the next two years, the litigation progressed through the courts, and the skidder sat at Byles Welding's storage yard in Many. In early 2002, Byles Welding and Allied Systems reached a compromise settlement of the litigation, and, on March 20, 2002, Byles Welding dismissed its suit against Allied Systems. Under the terms of the settlement, Allied Systems paid Byles Welding $95,000.00 and supplied it with a new brake system for the skidder. Additionally, the parties terminated their preexisting distributorship agreement.

In 2000, while Byles Welding was litigating its claim with Allied Systems, Randy reentered the timber harvesting business after a fifteen- to twenty-year absence. In the summer and early fall of 2002, while harvesting a tract of timber in southwest Louisiana, Randy's 640A John Deere skidder developed a hydraulic fluid leak which, because of environmental regulations, rendered it unusable. After the hydraulic leak manifested itself, two members of his work crew stopped by Byles Welding's yard, observed that there were skidders available for purchase, and reported their observations to Randy. By this time, the new brake system had been installed on the Allied Systems skidder, and all updating had been completed. However, the skidder had also accumulated over 900 hours of use.

After receiving the report from his employees, Randy personally traveled to the Byles Welding dealership and inspected the skidders in stock. He operated the controls, worked with the grapplers and blades, and checked out all of the functions of the Allied Systems skidder as it sat on the yard. On a subsequent weekend, he returned to Many and moved the skidder around the yard, again operating the various

control functions. After testing the skidder, he concluded that everything seemed to function properly and that it met his needs.

The negotiations that followed resulted in a number of interrelated agreements which ultimately placed the skidder at Randy's disposal. Initially, Byles Welding offered to sell the skidder to Randy for $157,000.00 and to accept his John Deere skidder as a trade-in. Randy owed Agriland Farm Credit Service Company (Agriland) $39,000.00 and had given it a security interest in the John Deere skidder. Thus, as a part of the trade-in, Byles Welding agreed to pay Agriland in full and to give Randy an additional credit of $12,000.00 toward the proposed sale.[1] Although Randy wanted to accept the offer of sale, he could not consummate the agreement because his credit was such that he could not obtain financing for the purchase price. Ultimately, by using E. G.'s good credit history, Clauriste arranged for financing through CIT Group/Equipment Financing, Inc. (CIT). However, the financing arrangement did not include an immediate transfer of ownership to either Randy or his father.

Instead, on October 28, 2002, Randy delivered his John Deere skidder to Byles Welding, and, on the same day, Byles Welding sold the Allied Systems skidder to CIT for $157,000.00 less the $12,000.00 credit given for the John Deere skidder. Two days later, CIT and E. G. executed a document entitled "**Texas Equipment Lease**" (lease contract), wherein CIT leased the Allied Systems skidder to E. G. for a term of sixty months beginning November 25, 2002. Specifically, the lease contract provided a total lease price of $191,400.00, to be paid in monthly installments of

---

[1] The testimony concerning the particulars of the trade-in value is somewhat confusing because Randy purchased a shear from Byles Welding at approximately the same time. In his testimony, Randy suggested that he received a $12,000.00 credit toward the purchase of the new skidder and a $25,000.00 credit against the purchase of the shear. In any event, on November 26, 2002, Byles Welding paid Agriland $39,000.00.

$3,190.00, with the first installment being due on December 25, 2002. It further provided that E. G. could purchase the skidder for an additional $101.00 at the end of the sixty-month term. Contemporaneously with the execution of the lease contract, E. G. executed a document directing CIT to pay Byles Welding $145,000.00. After the various transfer documents were executed, Clauriste then assisted the plaintiffs in obtaining comprehensive insurance coverage for the skidder through Amerisafe General Agency, Inc. (Amerisafe) of DeRidder, Louisiana.

No payments were ever made to CIT by the plaintiffs, and neither Randy nor E. G. took possession of the skidder. Approximately two to three weeks after the transactions were consummated, Randy informed Clauriste that he had changed his mind and did not intend to take possession of the skidder.

The skidder remained at the Byles Welding business location until January 21, 2003, when CIT took possession of it. On August 27, 2003, and acting pursuant to the terms of the lease contract, CIT sold the skidder to a third party for $59,000.00. By a letter dated October 3, 2003, CIT informed E. G. of the sale and made demand upon him for the payment of $100,783.79, CIT's calculation of the balance due under the lease contract.

The plaintiffs instituted suit against the defendants and CIT on March 24, 2003, seeking to set aside the entire transaction and to obtain a $12,000.00 judgment and an award of attorney fees.[2] The defendants initially responded to the suit by filing an exception of no cause of action addressing whether Clauriste should be maintained as a party defendant as well as an answer. On June 12, 2003, and before the

---

[2]The initial pleadings described the agreement as both a sale and lease. In doing so, Randy and E. G. asked for both recission of the sale and cancellation of the lease contract, as well as a judgment awarding them $12,000.00, representing the trade-in value, and attorney fees.

exception could be heard by the trial court, the plaintiffs amended their petition to add three additional causes of action directed solely against Byles Welding and Clauriste. Specifically, they asserted error as to the principal cause of the contract, violation of the Louisiana Unfair Trade Practices Act (hereinafter "LUTPA"), and fraud or intentional misrepresentation as additional grounds for setting aside the agreement. The defendants answered this amending petition and again asserted the exception of no cause of action. On July 8, 2003, CIT filed an answer to both the original and supplemental petitions.

After an August 12, 2003 hearing, the trial court granted the exception of no cause of action and dismissed Clauriste as a party defendant. The plaintiffs appealed that judgment, and this court reversed, concluding that the plaintiffs had stated a cause of action against Clauriste based on the fraud allegation. *See Alvis v. CIT Group Equipment Fin., Inc.*, 03-1364 (La.App. 3 Cir. 3/3/04), 867 So.2d 102.

On November 8, 2004, or one week before the trial on the merits was to begin, CIT and the plaintiffs settled their portion of the dispute and the plaintiffs dismissed CIT as a party to the litigation. In exchange for the dismissal, CIT agreed not to pursue its claim for any deficiency due under the lease contract and assigned the plaintiffs all rights it might have against Byles Welding and Clauriste.[3]

The principal factual dispute giving rise to most of the plaintiffs' assertions at trial and on appeal relates to the age and condition of the Allied Systems skidder. Randy testified that, in the negotiations surrounding the ultimate agreement, Clauriste misrepresented and/or suppressed the fact that the skidder was manufactured by Allied Systems in 1997, that it had been basically rebuilt because of the preexisting

---

[3]CIT had filed no pleadings adverse to Byles Welding or Clauriste at the time of its compromise with the plaintiffs.

problems, and that it had accumulated 900 hours of use by October of 2002. He asserted in testimony that he understood that he was purchasing a new 2002 skidder with approximately 90, not 900, hours of use. Randy testified that had he known the true age and history, he would not have entered into the various transactions. In fact, he gave as the reason he never took possession of the skidder his subsequent discovery of this history.

According to Randy, when he first visited Byles Welding's place of business, he examined the Allied Systems skidder and it "looked new." When he observed the hour meter, he read it as having less than 100 hours of activity. He testified that, as he was examining the skidder, Clauriste approached him and told him that the skidder was a 2002 model that had been used strictly on the yard. According to Randy, Clauriste was the only person with whom he spoke during the negotiation phase and no one else gave him any information concerning the skidder's history.

With regard to the actual negotiations with Randy, Clauriste testified that, although he talked to Randy by telephone before consummating the agreement, Virgil Jackson (Virgil), the corporation's service manager and his son-in-law, handled the direct negotiations. Although he testified that at some point he informed Randy that the skidder was manufactured in 1997 and that it had been involved in litigation, he further testified that he had no face-to-face contact with Randy or E. G. until they came to his office to consummate the agreement by signing the papers.

Virgil's testimony with regard to his participation in the negotiations generally supported that of Clauriste.[4] He testified that he personally showed Randy the

---

[4]The testimony conflicted in one respect. While Clauriste testified that he never came face-to-face with Randy before the agreement was completed, Virgil testified that Clauriste instructed him to take Randy to the yard to show him the skidder—thus implying that Clauriste was present and had met Randy face-to-face at some point before the final papers were signed.

6

skidder and, in doing so, advised him of the changes and updates that had been made to the skidder. Additionally, he told Randy that, while the skidder was considered new, it was approximately five years old and had been the subject of litigation. When Randy questioned him about the extensive use exhibited on the hour meter, he told him that the 900 hours arose primarily from testing.

When questioned at trial concerning why the skidder exhibited 900 hours of use, Clauriste testified that those hours had accumulated through the various replacement procedures to which it had been subjected as well as demonstrations to customers. According to Clauriste, it is standard practice to deliver a skidder to a potential purchaser for an on-the-job demonstration and the hours of use associated with those demonstrations did not cause the skidder to be classified as a used piece of equipment. As far as he was concerned, the skidder was "new" because it had never been sold.

Clauriste Byles, Jr. (Clauriste Jr.), who also worked for Byles Welding, testified concerning the history of the skidder and further testified that, had the skidder been purchased and used on a logging site, 900 hours would represent approximately only four months of continued use. Clauriste Jr. supported his father's testimony that it was standard in the industry to allow a potential customer to test a skidder on site for up to a week before purchasing it. With regard to the particular skidder at issue, he testified that anyone who observed the condition of the tires and paint would know that this was not a recently manufactured skidder.

Trial commenced on November 15, 2004, and, after completion of the evidence, the trial court took the matter under advisement. On January 27, 2005, the

7

trial court filed written reasons for judgment dismissing the plaintiffs' claims in their entirety. The trial court's reasons for judgment provide in pertinent part as follows:

The essential facts of the case are not disputed and have been adequately stated in brief and are not reiterated herein.

The Court finds as follows:

1. The claims for redhibition are unfounded. There was no sale between plaintiffs and defendant nor plaintiffs and CIT, only a sale between defendant and CIT. The "conditional sale" between plaintiffs and CIT was not fulfilled and therefore, plaintiffs were not legally subrogated to CIT so as to assume the legal status of "buyers".

2. The claim for fraud and misrepresentation is likewise unfounded. The law only allows these claims in a contract of sale. There being no sale between the parties, there is no legal basis for recovery.

In its reasons for judgment, the trial court did not address the plaintiffs' LUTPA claim.[5] The plaintiffs have appealed the judgment resulting from these reasons for judgment and, in doing so, have designated five issues for review. In designating the five issues, the plaintiffs did not set them forth as specifications or assignments of error as required by Uniform Rules—Courts of Appeal, Rule 2-12.4. Instead, they merely listed them as follows:

1. MANIFEST ERROR RULE

2. APPLICATION OF THE LEGAL DOCTRINE OF FRAUD

3. APPLICABILITY OF THE CIVIL CODE ARTICLES COVERING REDHIBITION

4. AMOUNT DUE PLAINTIFFS IN QUANTI MINORIS

5. ATTORNEY'S FEES

---

[5]In their post-trial brief in the trial court, the plaintiffs, confining their entire argument to their claims based on redhibition and fraud, did not mention their LUTPA claim at all. The trial court evidently believed they were not pursuing that claim. On this appeal of the judgment, they neither assigned as error nor briefed the trial court's failure to consider the claim. We agree with the trial court that the plaintiffs abandoned this claim at the trial level, and we will make no further reference to it.

## OPINION

### *Manifest Error*

Factual determinations made by the fact finder are subject to a manifest error analysis. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). We find no merit in the plaintiffs' first designated issue as the trial court made no contested factual determinations. Instead, the trial court simply concluded that the agreement at issue was of such a nature that it could not be challenged on the basis of redhibition, fraud, or misrepresentation. This represents a legal conclusion, the correctness of which will be considered in our evaluation of the merits of the other issues raised. With regard to the remaining issues, we find that they overlap and that resolution of the redhibition and fraud issues also disposes of the remaining two.

### *Redhibition*

The action in redhibition is recognized in La.Civ.Code art. 2520, *et seq*. With regard to the availability of the redhibition remedy, La.Civ.Code art. 2520 provides:

> The *seller* warrants the *buyer* against redhibitory defects, or vices, in the thing sold.
>
> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
>
> A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

(Emphasis added.)

9

Thus, a redhibition cause of action relates to error in the cause of completed sales, and, absent a sale, the redhibition articles do not apply. *Stack v. Irwin*, 246 La. 777, 167 So.2d 363 (1964).

As pointed out by the trial court in its reasons for judgment, there exists no sales contract between the plaintiffs and the defendants. The transaction which gave the plaintiffs the right to possess the Allied Systems skidder is the lease contract entered into between the plaintiffs and CIT. Specifically, we find that the agreement is not a conditional sale as concluded by the trial court, but a financed lease as defined by La.R.S. 9:3306(12)(b). Financed leases are "recognized as valid and enforceable in this state." La.R.S. 9:3302. Still, although the trial court erred in its classification, because the transaction at issue is not a sale, the redhibition articles do not apply as between the plaintiffs and the defendants.

Having concluded that the plaintiffs do not have any direct redhibition rights against the defendants, we must next consider what indirect redhibition rights they may have acquired by virtue of their settlement with CIT, because it is not disputed that Byles Welding did sell the skidder to CIT, creating a transaction subject to an action in redhibition. Importantly, in settling with CIT, the plaintiffs gave up their rights against CIT with regard to the lease agreement. In doing so, they derived nothing more than a conventional subrogation and assignment of whatever rights CIT had against the defendants.

"Subrogation is the substitution of one person to the rights of another." La.Civ.Code art. 1825. It "is the legal fiction established by law whereby an obligation, extinguished with regard to the original creditor by payment which he has received from a third person, or from the original debtor but with funds that a third

10

person has provided, is regarded as substituting in favor of this third person who in essence steps into the shoes of the original debtor and is entitled to assert, in the measure of what he has paid, the rights and actions of the former creditor." *A. Copeland Enters., Inc. v. Slidell Mem'l Hosp.*, 94-2011, p. 5 (La. 6/30/95), 657 So.2d 1292, 1296. Conventional subrogation occurs when an obligee, who receives performance from a third person, subrogates that person to his rights, even without the obligor's consent. La.Civ.Code art. 1827. Regarding this latter article, Revision Comment (a) points out that there is no distinction between conventional subrogation by the obligee and an assignment of rights.

Louisiana Civil Code Article 2642 provides for the assignment of rights. When an assignment occurs, the assignee is subrogated to the rights of the assignor against the debtor. *Id.* It is axiomatic that an assignee or a conventional subrogee occupies a no more favorable position in a dispute than the original assignor or subrogor. "An assignment does not alter the nature of the obligation . . . ." 1 Saul Litvinoff, The Law of Obligations § 17.35, at 557, in 5 Louisiana Civil Law Treatise (2001).

The written settlement agreement between the plaintiffs and CIT expressly subrogates the plaintiffs to and assigns all rights CIT had against Byles Welding and Clauriste. We find that this subrogation and assignment would include any redhibition rights CIT might have against the defendants. Although a party may acquire a right to demand performance of an obligation, that party must first prove the existence of the obligation. La.Civ.Code art. 1831. Since the assignee occupies a no more favorable position in a dispute than the original assignor, it is requisite that the claim be proved, and the burden of proof is upon the assignee. *Castille v. Glassell-Taylor Co.*, 18 So.2d 839 (La.App. 2 Cir. 1944). Therefore, the plaintiffs,

11

as subrogees and assignees of CIT's claim against the defendants, had the burden of proving by a preponderance of the evidence any claim of redhibition that CIT had against the defendants. We do not find that this burden has been sustained.

While the plaintiffs assert that they had been mislead in the transaction, they presented no evidence to establish CIT's understanding of the condition or history of the skidder at the time of the sale, or that CIT considered that it contained any vices or defects, or that CIT suffered any damage as a result of its dealings with Byles Welding or Clauriste. In fact, although the invoice from Byles Welding to CIT does not state the year of manufacture of the skidder, the acknowledgment signed by E. G. as a part of the lease agreement makes it clear that CIT was aware that the skidder was a 1997 model. Therefore, while we do not agree with the trial court's classification of the lease agreement as a conditional sale, we find no error in the trial court's conclusion that the plaintiffs cannot directly or indirectly claim redhibition rights against the defendants.

### *Fraud*

The plaintiffs assert that the defendants deliberately misrepresented the age and history of the skidder and that these acts and omissions constitute fraud. They further assert that the trial court erred as a matter of law in concluding that the law does not provide for a remedy for fraud outside of the framework of a contract of sale.

Consent to a contract may be vitiated by error, fraud, or duress. La.Civ.Code art. 1948. Fraud is defined in La.Civ.Code art. 1953 as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." One need prove only

by a preponderance of the evidence that fraud exists, and a plaintiff's burden of proof may be satisfied by circumstantial evidence. La.Civ.Code art. 1957.

"A finding of fraud . . . is a factual determination . . . ." *Chambers v. Kennington*, 35,079, p. 7 (La.App. 2 Cir. 9/28/01), 796 So.2d 733, 737. However, the trial court in this matter made no factual findings with regard to the fraud issue because it found as a matter of law that a claim of fraud is not applicable to any contract other than a contract of sale. We find that the trial court erred in this regard as a matter of law, as we find nothing in the law or jurisprudence to support this conclusion. "[W]hen appellate courts find that a reversible error of law . . . was made in the lower court, appellate courts are required to redetermine the facts de novo from the entire record and render a judgment on the merits." *Bennett v. State Farm Ins. Co.,* 03-1195, p. 3 (La.App. 3 Cir. 3/24/04), 869 So.2d 321, 325. Accordingly, we have examined the record to determine if the defendants fraudulently misrepresented the age and condition of the skidder, and we find that the evidence does not preponderate in favor of the plaintiffs on this issue.

In addition to Randy's testimony concerning what he asserts was orally related to him by Clauriste, the plaintiffs introduced one of the credit applications that had been unsuccessfully submitted on Randy's behalf. This credit application listed the skidder as a 2001 model. Additionally, they introduced the insurance policy issued to E. G. through Amerisafe, which describes one of the pieces of equipment insured as a 2002 skidder. The argued inference from these exhibits is that the information on these two documents was supplied by Clauriste or others associated with Byles Welding and that they support the plaintiffs' claim that the defendants fraudulently represented the skidder as a newer model than a 1997. However, no one from the

credit agency or the insurance agency testified concerning where he/she acquired the information used in describing the skidder in the documents.

The plaintiffs also introduced a copy of a 1998 demonstration invoice that contained the language "un hook hour meter." Randy said he knew the skidder had some hours on it because he observed the hour meter the first time he inspected the skidder and erroneously read it as 90 hours rather than 900. The apparent purpose of this exhibit was to show by circumstantial evidence that the defendants regularly disconnected the hour meter to misrepresent the true time use on a given skidder. Clauriste denied that there had ever been any tampering with the hour meter.

In addition to the testimony of Clauriste and Virgil concerning full disclosure, the defendants introduced a document entitled "Certificate of Acknowledgment and Acceptance of Purchased Equipment," which was executed by E. G. contemporaneously with the lease agreement and which clearly states that the skidder is a 1997 model. Clauriste also testified without contradiction that in the logging industry a skidder that had never been titled out from the dealer to a purchaser is still considered to be a new piece of equipment.

Although neither Randy nor E. G. ever took possession of the skidder, Randy was given full access to it on two separate occasions, tested it thoroughly, and came away from the testing fully satisfied that "[a]ll the functions that [were] important" functioned properly. On both of these occasions, he was able to clearly observe the hour meter and simply misread the time recorded thereon. The fact that the skidder had over 900 hours on it was firmly established and easily discoverable by a simple inspection. Particularly, Randy was fully capable of having discovered it, given his

testimony that he was familiar with such machinery, having been around it all of his life.

This evidence being considered in the light of reason and probability, we find that the plaintiffs failed to prove fraud by a preponderance of the evidence. Therefore, we find no merit in this argument.

### *Quanti Minoris and Attorney Fees*

Both of these arguments fall absent the plaintiffs prevailing on either their redhibition or fraud argument. Having found both the redhibition and fraud arguments to be without merit, we find it unnecessary to address these last two arguments.

### DISPOSITION

For the foregoing reasons, we affirm the judgment of the trial court and assess all costs of this appeal to Randy and E. G. Alvis.

**AFFIRMED.**