hWALTZER, Judge.
PROCEDURAL HISTORY
Plaintiffs/appellants, Leon J. Descant, Jr. and Deborah G. Descant, filed this medical malpractice action against defendants/appel-lees, The Administrators of the Tulane Educational Fund, d/b/a Tulane Medical Center (“TMC”) Hospital and Clinic, and Eduardo Herrera, M.D., pursuant to the Louisiana Medical Malpractice Act, La.Rev.Stat. 40:1299.41. Plaintiffs filed a request for review by a Medical Review Panel (“MRP”) alleging that defendants were negligent in their care and treatment of Mrs. Descant when she was pregnant with and during the birth of her daughter, Edith, and that defendants failed to obtain Mrs. Descant’s “informed consent” to a vaginal delivery. Plaintiffs also alleged that defendants’ negligence caused Edith to sustain- injuries during her November 3,1989 birth at TMC Hospital and Clinic.
A. The Medical Review Panel Proceeding-
The MRP was comprised of three obstetri-eian/gynecologists: Stephen A. Cohen, M.D., Charles Farris, M.D., Jr., and Harvey Ga-bert, M.D. The MPR rendered an Opinion finding that the evidence did not support the conclusion that defendants failed to meet the applicable standard of care. The MPR stated the following Written Reasons for its Opinion:
Dr. Herrera performed the proper tests, including amniocentesis and fetal lung maturity tests showing mature development and the decision to induce was appropriate. IgAlthough the decision for serial induction was appropriate, it was not necessary, because the patient’s membranes ruptured during augmentation, which mandated continued attempts to produce labor.
Shoulder dystocia was not a material risk based on the information available to Dr. Herrera, his physical examination and the ultrasound findings. When it occurred, Dr. Herrera did appropriately respond to the problem.
The information available to Dr. Herrera did not indicate the baby was so large that cesarean section should have been done. The patient had previously vaginally delivered a nine pound, fifteen ounce baby, which indicated that the patient, more probably than not, had an adequate pelvis for a macrosomie baby.
The care rendered by Tulane was appropriate.
B. Pretrial Proceedings
Following the MRP’s review of this case, plaintiffs filed a Petition for damages against *622 defendants in the Civil District Court of the Parish of Orleans. Intervenor/appellant, Canal Barge Company, Inc. (“Canal Barge”), Mr. Descant’s employer, intervened in this action to seek reimbursement for medical benefits paid on behalf of Edith Descant.
Plaintiffs later amended their Petition for damages to add Lexington Insurance Company (“Lexington”), Tulane University’s general comprehensive excess liability insurer, as a defendant pursuant to the Louisiana Direct Action Statute, La.Rev.Stat. 22:655. Lexington filed peremptory exceptions of no cause and no right of action against TMC Hospital and Clinic and Dr. Herrera for any amount above $100,000, and that the Act’s limitation of liability was not a defense personal to TMC Hospital and Clinic and Dr. Herrera. This Court unanimously affirmed the trial court’s judgment. Descant v. Administrators of the Tulane Educational Fund, 627 So.2d 214 (La.App. 4 Cir.1993). The Louisiana Supreme Court subsequently granted plaintiffs’ writ application, but affirmed the trial court and this Court’s holding that the Medical Malpractice Act eliminates a hmedical malpractice plaintiffs cause of action against a qualified health care provider for any amount in excess of $100,000. Descant v. Administrators of Tulane Educational Fund, 93-3098 (La.7/5/94), 639 So.2d 246.
On September 21, 1994, plaintiffs filed a Fourth Supplemental and Amended Petition alleging that the Medical Malpractice Act’s limitation of liability was unconstitutional “as applied” where the health care provider had obtained excess liability insurance. On March 17, 1995, the trial court sustained defendants’ exceptions of no cause of action and res judicata, and dismissed the plaintiffs’ Fourth Supplemental and Amended Petition with prejudice, which the plaintiffs did not appeal.
C. Trial
Jury trial was scheduled to begin on April 3, 1995, with the Honorable Yada T. Magee presiding. On March 29, 1995, defendants filed an exception of no cause and no right of action contending that Canal Barge had no action against defendants for medical benefits paid on behalf of Edith Descant. On March 31, 1995, Canal Barge filed a motion for leave to file an amended petition to allege that it had obtained an assignment of subro-gation rights from its insurer, Provident Life and Accident Insurance Company (“Provident”).
On April 3, 1995, the trial court heard all motions in limine, as well as defendants’ exception of no cause and no right of action against Canal Barge. The trial court granted defendant’s motion in limine, holding that Mrs. Descant failed to state a separate cause of action for damages independent of damages sustained by Edith Descant. Additionally, the trial court sustained defendants’ exception of no cause and no right of action and dismissed Canal Barge from this suit, with prejudice.
^Defendants then stipulated that if plaintiffs prevailed on liability and causation, plaintiffs’ damages exceeded the Medical Malpractice Act’s $500,000 limitation on general damages, and that Edith Descant was in need of and entitled to future medical care and benefits pursuant to the Act. Defendants further stipulated that Canal Barge had paid $525,000 and Medicaid had paid $270,000 in medical benefits on behalf of Edith Descant throügh the time of trial. Overruling plaintiffs’ objections, the trial court accepted defendants’ stipulations and granted defendants’ motion to exclude as irrelevant plaintiffs’ evidence of damages.
Plaintiffs filed an application for an emergency supervisory writ with this Court contending that the trial court improperly accepted ' defendants’ stipulation regarding damages, and improperly found that plaintiffs’ proposed damages evidence was irrelevant and inadmissible. By a two-to-one vote, this Court affirmed the trial court’s ruling that plaintiffs’ damages evidence was irrelevant in light of defendants’ stipulation. Descant v. Administrators of Tulane Educational Fund, No. 95-0751 (La.App. 4 Cir. 4/5/95), 653 So.2d 819.
On remand to the trial court the plaintiffs urged that the substance of the defendants’ stipulations be read to the jury. The trial court refused. The defendants then moved to exclude all evidence concerning harm or *623 damage sustained by the plaintiffs. The trial court granted that motion and refused to allow testimony regarding damages and refused to communicate to the jury that the defendants had judicially admitted that the plaintiffs’ harm exceeded $500,000 and the necessity for future medical care. Plaintiffs then moved to find the Medical Malpractice Act unconstitutional as applied, alleging the defendants’ unilateral [ ¡¡admissions had effected a denial of plaintiffs’ right to present evidence. This oral motion was denied as well.
The jury trial proceeded on April 5, 10, 11, 17, 18, 19, and 20, 1995. Plaintiffs called as witnesses: Joseph Bruner, M.D., a perinatol-ogist from Tennessee; Kenton Holden, M.D. (by deposition), a pediatric neurologist from South Carolina; Mr. and Mrs. Descant; and Dr. Herrera. Defendants called as .witnesses: the three MRP members, Dr. Cohen, Dr. Farris, and Dr. Gabert; F. Gary Cunningham, M.D., an expert obstetrician/gynecologist from Dallas, Texas; Rosie Davis, R.N., a Registered Nurse who assisted Dr. Herrera during the delivery; and Dr. Herrera. On rebuttal, plaintiffs called Mr. Descant and Edith Descant’s former treating pediatrician, Lynn S. Mason, M.D.
At the close of plaintiffs’ case, the trial court directed a verdict in favor of defendant, TMC Hospital and Clinic, finding that “even though there was testimony that perhaps certain departments did not do something that it should have done, there is no testimony or proof of evidence introduced to prove that failure to do something was the causing factor to plaintiffs’ damages.”
The plaintiffs’ case' against Dr. Herrera went to the jury, which rendered a verdict in favor of Dr. Herrera. Answers to the jury interrogatories reveal that all' twelve jurors found: (1) plaintiffs did not prove the degree of care ordinarily exercised by physicians practicing in the same field as Dr. Herrera, and (2) Dr. Herrera did not fail to obtain Mrs. Descant’s informed consent to delivery by vaginal delivery.
D. Posttrial
' Canal Barge filed a devolutive appeal from the trial court’s judgment granting defendants’ exception of no cause and no right of action against Canal | (¡Barge. The Descants also filed a devolutive appeal of the- trial court’s judgment granting a directed verdict in favor of TMC Hospital and Clinic and the judgment entered on the jury verdict in favor of Dr. Herrera.
STATEMENT OF THE FACTS
In February of 1989, Mrs. Descant was having .problems with her menstrual period and went to a gynecologist in Alexandria, Louisiana, who diagnosed a Bartholin gland cyst and recommended a hysterectomy and repair of a rectocystocele. Reporting a history of diabetes since 1986 and left leg thrombophlebitis- since 1984, Mrs. Descant’s Alexandria physician referred her to Tulane Medical Center to have the surgery.
Dr. Herrera, who was to perform the hysterectomy, first saw Mrs. Descant on February 28, 1989. Mrs. Descant, weighing in at 217.6 pounds, reported having her last menstrual period from February 13 to 18, 1989. She also discussed with Dr. Herrera the details of a very difficult prior pregnancy in 1971; Mrs. Descant was in labor for over 17 hours, ultimately delivering a 9 pound 15 ounce boy with the use of forceps. During the delivery, Mrs. Descant hemorrhaged so severely that she required a blood transfusion.
In acquiring Mrs. Descant’s consent to perform the hysterectomy, Dr. Herrera informed the Descants that Mrs. Descant’s medical problems, including her weight, put her at an increased risk of infection and bleeding. Dr. Herrera also counseled Mrs. Descant regarding the need to control her diabetes and informed her that she would probably need Heparin prophylaxis before surgery and recommended blood flow studies of her legs. Mrs. Descant consented to these procedures.
|7On March' 19, 1989, Mrs. Descant was admitted to TMC Hospital and Clinic for the scheduled hysterectomy. Routine pre-opera-tive tests indicated that Mrs. Descant was pregnant. Mrs. Descant’s scheduled hysterectomy was cancelled and Dr. Herrera counseled the Descants as to their choice to either *624 proceed with the pregnancy or to terminate it.' In assisting the Descants in making their decision whether to proceed with the pregnancy, Dr. Herrera explained that Mrs. Descant’s age (36 years old), weight (217.6 lbs.) and medical condition (diabetes) put her at high risk of having a baby with a birth defect or having a miscarriage. Nevertheless, the Descants decided to continue the pregnancy. Thereafter, Mrs. Descant continued to see Dr. Herrera as her obstetrician and Dr. Jan Cooper, a Tulane diabetologist, for her diabetes.
■ From March through October 1989, Mrs. Descant’s pregnancy progressed without complication. Dr. Herrera and Dr. Cooper examined Mrs. Descant on 19 different occasions and had TMC technicians perform 6 ultrasounds on her, as reported in the following medical records:
April 13,1989 Dr. Herrera performed a vaginal ultrasound, which confirmed that she was at eight weeks gestation and had an estimated due date of November 22, 1989. Dr. Herrera noted that Mrs. Descant’s pelvis was “gynecoid,” which is the preferred type of pelvis for vaginal delivery of a baby. Dr. Cooper checked Mrs. Descant’s blood glucose level, which was normal.
April 27, 1989 Dr. Herrera and Dr. Cooper examined Mrs. Descant and noted that she was progressing well and that her blood glucose remained well controlled with insulin.
May 16, 1989 Dr. Herrera and Dr. Cooper examined Mrs. Descant and cited no problems. An ultrasound showed a single viable intrauterine pregnancy of 13 weeks, a normal amount of amniotic fluid and an anterior placenta. Dr. Cooper reported that Mrs. Descant’s blood glucose levels were “excellent” and well controlled with insulin.
June 6, 1989 Dr. Herrera and Dr. Cooper examined Mrs. Descant and reported that Mrs. Descant was doing well and her blood Rglucose remained well controlled with insulin. Blood flow studies of her legs showed no evidence of venous obstruction in either leg.
June 13, 1989 Dr. Herrera and Dr. Cooper examined Mrs. Descant and reported that Mrs. Descant was doing well and her blood glucose remained well controlled with insulin. Blood flow studies of her legs showed no evidence of venous obstruction in either leg.
July 11, 1989 Dr. Herrera and Dr. Cooper examined Mrs. Descant and reported that Mrs. Descant was doing well and her blood glucose remained well controlled with insulin. Blood flow studies of her legs showed no evidence of venous obstruction in either leg.
August 8,1989 Dr. Herrera ordered an ultrasound on Mrs. Descant, which showed a 26 week pregnancy and an expected due date of November 20,1989, representing appropriate fetal growth.
August 29, 1989 Dr. Herrera examined Mrs. Descant and reported a fundal height of 34 centimeters.
Sept. 12, 1989 Dr. Herrera examined Mrs. Descant and noted active fetal movement. Dr. Herrera reported a fundal height of 36 centimeters.
Sept. 26, 1989 Dr. Herrera examined Mrs. Descant and reported a 32 week gestational age. An ultrasound indicated a single live intrauterine pregnancy at thirty-five weeks. These measurements were at the upper level of normal for a standard deviation plus/minus three weeks. The ultrasound provided two estimated fetal weights: 2,665 grams and 2,691 grams. Mrs. Descant’s fundal height was 37 centimeters.
Oct. 10, 1989 Dr. Herrera examined Mrs. Descant and reported a fundal height of 39 centimeters. Mrs. Descant voiced no unusual complaints.
Oct. 17, 1989 Dr. Herrera examined Mrs. Descant, who was complaining of lower episodic pelvic pressure. Her cervix was closed and posterior. Her blood glucose was within normal limits and well controlled on insulin. Fetal movement was noted daily.
Oct. 20, 1989 Dr. Herrera examined Mrs. Descant, who was having positive contractions with a non-stress test. An ultrasound revealed a single live intra *625 uterine pregnancy -with positive fetal movement, positive fetal breathing, good fetal tone and an adequate amount of clear amniotic fluid. The ultrasound indicated a mean composite gestational age equal to approximately 37.8 weeks, |9and two fetal weights of 3,327 grams and 3,526 grams, or about 7 pounds and 5 ounces. An amniocentesis indicated immature fetal lung development. Mrs. Descant had irregular contractions with no decelerations. She was discharged home and instructed to return to see Dr. Herrera on October 23,1989.
Oct. 23, 1989 Dr. Herrera examined Mrs. Descant, who was taken to the ultrasound room for a biophysical profile. This profile revealed positive fetal breathing, positive fetal movement, and an adequate amount of amniotic fluid.
Oct. 24,1989 Dr. Cooper examined Mrs. Descant and noted that her blood glucose levels were well controlled with insulin. Mrs. Descant was noted to be having contractions and a gestational age of thirty-six weeks.
Oct. 27, 1989 Dr. Herrera examined Mrs. Descant and noted positive fetal movements and a gestational age of thirty-six four/seven weeks. Dr. Herrera instructed Mrs. Descant to schedule a return examination on October 31,1989.
Oct. 31, 1989 Dr. Herrera examined Mrs. Descant and noted active fetal movement. Mrs. Descant’s blood glucose was well controlled and Dr. Herrera informed her that if the November 1,1989, amniocentesis confirmed fetal lung maturity, he would recommend the augmentation of labor because she was already having irregular contractions.
On November 1, an amniocentesis was performed by the TMC Hospital and Clinic with direct ultrasound guidance. The amniocentesis indicated mature fetal lung development. Because the baby’s lungs were fully developed and Mrs. Descant was at 37 weeks gestation and had a history of having large babies, Dr. Herrera recommended that she deliver three weeks early. Accordingly, on November 2,1989, at 7:00 a.m., Mrs. Descant was admitted to TMC Hospital and Clinic for induction of labor and anticipated vaginal delivery.
At the time of Mrs. Descant’s admission into the hospital, she was having irregular contractions and her cervix was 1 cm. dilated, ninety percent effaced, and posterior. Her blood glucose level was within normal limits. An external fetal monitor was applied and fetal heart rates were within normal limits. At 7:45 a.m., lipa Pitocin infusion was started to induce labor. By 10:30 a.m., Mrs. Descant’s labor was progressing normally and she was having mild contractions every three to four minutes. At 3:20 p.m., Mrs. Descant’s water broke and at 7:10 p.m., anesthesia placed an epidural catheter for epidural anesthesia. At 8:00 p.m., Dr. Herrera performed a vaginal examination on Mrs. Descant which revealed her cervix to be 2 cm. dilated, ninety percent effaced, with the fetus at a -1 station. Between 6:30 p.m. and 11:30 p.m., Mrs. Descant had sixty second moderately intense contractions every three to four minutes. At-11:00 p.m., Dr. Herrera examined Mrs. Descant and her cervix was 2 cm. dilated, one hundred percent effaced, with the fetus at a -1 station.
On November 3, 1989, at 3:22 a.m., Dr. Herrera performed a vaginal examination of Mrs. Descant which revealed her cervix to be completely dilated -with the fetus at -1/0 station. With the assistance of two registered nurses, Dr. Herrera instructed Mrs. Descant to start pushing. At 4:28 a.m., the fetal monitor showed decreased beat-to-beat variability and variable decelerations. The fetal monitor was removed and Dr. Herrera applied low Simpson forceps. Dr. Herrera performed a right mediolateral episiotomy and the baby’s head was delivered, with the umbilical cord wrapped around its neck. Dr, Herrera reduced the umbilical cord and suctioned the baby’s nose and mouth with a syringe bulb immediately upon delivery of the head. Dr. Herrera proceeded with downward traction of the head, to bring about descent of the anterior shoulder, but the anterior shoulder would not descend. Dr. Herrera diagnosed shoulder dystocia and instructed the nurses to apply suprapubic pressure. Anesthesia was paged to the delivery room and suprapubic pressure was *626 continually applied by the nurses without success. The nurses then preformed the McRoberts maneuver, however Dr. Herrera could lnnot disimpaet the anterior shoulder. Dr. Herrera tried to rotate the impacted shoulders, but was unsuccessful.
Approximátely seven minutes after the fetal monitor first revealed decreased beat-to-beat variability and variable decelerations, anesthesia placed Mrs. Descant under general anesthesia. Within a minute, the McRo-berts maneuver was again done by the nurses without success. At 4:38 a.m., Dr. Flynn, an O/B resident, arrived in the delivery room and assisted the nurses in applying suprapu-bic pressure. After several attempts, Dr. Herrera successfully rotated the posterior shoulder in á clockwise fashion and delivered the posterior shoulder anteriorly. The anterior shoulder was then delivered posteriorly. At 4:44 a.m., the baby was delivered, weighing 10 pounds and 13 ounces.
Upon delivery, the baby was flaccid. The cord was clamped and cut, and the. baby given to the pediatric resident in attendance. The baby’s color was pale and there were no spontaneous respirations or muscle tone. The baby was incubated and chest compressions were started. At 5:00 a.m., resuscitation maneuvers were stopped. However, at 5:01 a.m., the cord was pulsating and resusei-tative measures were reinstituted. The báby was then taken to the neonatal intensive care unit. Although Edith Descant survived, she suffered profound brain damage.
ASSIGNMENTS OF ERROR:
1. Whether the trial court erred in sustaining defendants’ exception of no right or cause of action dismissing Canal Barge?
2. Whether the trial court erred when it directed a verdict in favor of TMC Hospital and Clinic?
3. Whether the jury erroneously, concluded that plaintiffs failed to prove the applicable standard of care?
1124. Whether the trial court manifestly erred in instructing the jury regarding the standard of care and liability in a medical malpractice case?
5. Whether the trial court’s Jury Instructions and Interrogatories regarding informed consent were manifestly erroneous? ■
6. Whether the trial court erred by refusing to instruct the jury that defendants had stipulated that plaintiffs’ damages equaled $500,000?
7. Whether the trial court erred by holding that plaintiffs'were not entitled to a separate “cap” on damages with respect to their individual claims for damages?
8. Whether plaintiffs’ assignment of error regarding the unconstitutionality of the Louisiana Medical Malpractice Act’s provisions regarding payment of future medical expenses as they accrue is timely and proeedurally correct?
STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the' absence of “manifest error” or unless it is “clearly wrong.” Where conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otheiwise complete, the appellate court should make its own independent de novo review of the record and decide the case by a preponderance of the evidence. Ferrell v. Fireman’s Fund, 650 So.2d 742, 746 (La.1995).
1. ASSIGNMENT OF ERROR NO. 1: Whether the trial court erred in dismissing Canal Barge for no right or cause of action?
Canal Barge, the first appellant, appeals the trial court’s judgment granting defendants’ exception of no cause and no right of action and dismissing Canal Barge with prejudice. Pursuant to the Louisiana Supreme Court’s decision in Copeland Enterprises, Inc., v. Slidell Memorial Hospital, this Court is without | ^jurisdiction to deter *627 mine Canal Barge’s subrogation rights for past medical benefits paid on behalf of Edith Descant. 657 So.2d 1292, 1301 (La.1995). Similarly, the trial court judgment is null and void because that court also lacked subject matter jurisdiction to adjudicate the question of whether Canal Barge or any other person is entitled to collect future medical expenses reimbursements from the Plaintiffs Compensation Fund. Id.
Canal Barge’s employee welfare benefit plan, which is self-funded by Canal Barge and subject to ERISA, paid medical benefits to or on behalf of Edith Descant in the stipulated amount of $525,000. The payments were made by Provident, the administrator of the Plan. The Plan provided that Provident would be subrogated to any payments made to beneficiaries such as Edith Descant which resulted from the acts or omissions of third parties such as defendants. By assignment from Provident, Canal Barge asserts its right to conventional subrogation for the benefits paid out to the Descants under the Plan.
The issue of Canal Barge’s right of subro-gation is a matter to be decided under the federal ERISA statute, the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1001 et seq. Under ERISA, Congress explicitly set forth provisions granting federal district courts exclusive jurisdiction in civil actions brought by fiduciaries attempting to enforce the terms of a benefit plan. 29 U.S.C. Sec. 1132(a)(3)(B)(ii). Accordingly, the federal district court has exclusive subject matter jurisdiction to determine whether Canal Barge is entitled to reimbursement pursuant to a subrogation agreement.
2. ASSIGNMENT OF ERROR NO. 2: Whether the trial court erred when it directed a verdict in favor of TMC Hospital and Clinic.
The trial court erred in directing a verdict in favor of TMC Hospital and Clinic. Pursuant to Louisiana Code of Civil Procedure article 1810, a motion for |i4directed verdict is properly granted if, in viewing the facts in light most favorable to the non-moving party, the trial court concludes that the evidence is such that. reasonable and fairminded jurors cannot arrive at a verdict in favor of the non-moving party. Graham v. Ryan, 93-2155 (La.App. 4 Cir. 7/27/94), 641 So.2d 677, 678, writ denied, 94-2538 (La.12/19/94), 648 So.2d 403. In determining whether a trial court properly granted a directed verdict, the appellate court need not decide whether plaintiffs established their case by a preponderance of the evidence. Rather, the reviewing court need only decide whether reasonable, impartial minds could have reached a different conclusion. Clibum v. Colonial Penn Ins. Co., 583 So.2d 103, 105 (La.App. 3 Cir.1991).
After review of plaintiffs evidence vis-a-vis TMC Hospital and Clinic, we find that fair and reasonable minded persons could conclude that TMC Hospital and Clinic was negligent and that its negligence was a cause in fact of Edith Descant’s injuries. For that reason, the trial court’s grant of a directed verdict at the close of plaintiffs ease was error. Specifically, plaintiff presented evidence which showed that on November 1, Dr. Herrera ordered an ultrasound fetal weight measurement and an ultrasound amniocentesis. However, TMC Hospital and Clinic’s Radiology Department failed to perform the ultrasound fetal weight measurement and instead, mistakenly sent Dr. Herrera the weight measurement of another patient under Mrs. Descant’s name. Dr. Herrera testified that had he been provided with accurate fetal weight measurement, he would have performed a c-section which would have avoided the -ultimate tragedy which occurred in this case.
It is argued that because the weight measurement of November 1 was obviously not that of Mrs. Descant, Dr. Herrera could have and should have | ^reordered another ultrasound fetal weight measurement, but didn’t. Perhaps that may be a valid argument, and perhaps the jury would have relied on it to exonerate TMC Hospital and Clinic, however for purposes of deciding the issue before us, that argument is irrelevant. The directed verdict was rendered at the close of plaintiffs case. We determine only that at that point in the trial the evidence was sufficient *628 to convince reasonable jurors that TMC was negligent. Of'course, TMC had not presented any evidence at that point, and were not required to do so after the trial court granted the directed verdict in their favor. See, La. C. Civ. Pro. Art. 1810. Accordingly, we reverse the directed verdict in favor of TMC Hospital and Clinic and remand for a trial on the merits.
3. ASSIGNMENT OF ERROR NO. 3: Whether the jury erroneously concluded that plaintiffs failed to prove the applicable standard of care?
Following a thorough review of the record, we do not find that the jury committed manifest error in unanimously finding that the testimony of plaintiffs’ expert witness, Dr. Bruner, did not establish the standard of care applicable to Dr. Herrera. The record supports the jury’s conclusion, as plaintiffs’ expert witness presented medical opinions that were unsupported and contradicted by every other physician who testified in this case.
In a medical malpractice action against a physician, a plaintiff bears the burden of proving the requisite standard of care, that the physician breached that standard of care, and that the breach caused the plaintiffs injury. La.Rev.Stat. Ann. Sec. 9:2794(A) West 1991. The plaintiff must prove the physician’s alleged negligence by a preponderance of the evidence. Injury alone does not raise a presumption that the physician was negligent. La.Rev.Stat. Ann. Sec. 9:2794(C). See Pitre v. Opelousas Gen. Hosp., 530 So.2d 1151 (La.1988); Barre v. Nadell, 94-1883 (La.App. 4 Cir. 6/7/95), 657 So.2d 514, 518. The | ^burdens imposed by section 9:2794 are questions of fact and are thus subject to the manifest error/clearly wrong standard of review. Thus, the jury’s finding that plaintiffs failed to prove the applicable standard of care was a finding of fact properly made by the jury. A plaintiff does not prove the standard of care by operation of law simply by the presentation of some expert testimony.
To determine whether plaintiff has met this burden, courts rely on qualified expert witnesses who are members of the defendant’s profession. The expert’s qualifications and experience, as well as the facts, determine the weight to be given the expert’s testimony. Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 878 (La.App. 5 Cir.1991).
Here, the jury could have reasonably questioned Dr. Bruner’s qualifications and experience as an expert. Dr. Bruner admitted that he had not practiced as a general obstetrician/gynecologist since 1986. Rather, Dr. Bruner testified that he spends between one half to two thirds of his time performing ultrasounds, and delivers only 4 to 6 babies a month. Dr. Bruner also admitted that his c-section rate was greater than 50% — a rate double the national norm.
Moreover, on cross-examination, Dr. Bruner hesitantly admitted that he had been sued as the “principle target” in a shoulder dysto-cia case, similar to this case, in which the child developed a neurologic deficit known as Erb’s palsy — a common risk that flows from shoulder dystocia. Dr. Bruner admitted that the central issue in that ease was whether or not he should have performed a c-section, which he did not do. When asked to explain his previous statement directed to Dr. Herr■era suggesting “what kind of doctor would purposely subject his patient” with a risk of shoulder dystocia to a vaginal delivery, Dr. Bruner prefaced his statement with, “I don’t believe anybody involved [in my malpractice suit] intended harm to |17the baby or the mother.” Later, Dr. Bruner retracted his statement regarding “what kind of doctor” Dr. Herrera was, in performing a vaginal delivery of a baby with shoulder dystocia. This testimony could have effected the jury’s opinion as to Dr. Bruner’s credibility. Additionally, the jury could have reasonably concluded that if an “expert” in the field performed a vaginal delivery of a baby with shoulder dystocia and experienced a similar unfortunate outcome, it would not be unreasonable for Dr. Herrera to act in the same manner without violating any standard of care.
In addition to Dr. Bruner’s questionable credentials as an expert, Dr. Bruner failed to consider numerous significant facts of record in formulating his opinions. Specifically, Dr. *629 Bruner admitted that he did not know or consider the fact that Mrs. Descant had a large pannus of fat between February 1989 and November 1989. Dr. Bruner further admitted that a large pannus of fat can alter or modify the ability to measure fundal height.
With regard to the status of Mrs. Descant’s diabetes during the course of her pregnancy, Dr. Bruner testified that Mrs. Descant’s blood sugar “was not in good control.” Dr. Bruner later retracted his statement, as the medical records show that Mrs. Descant’s blood glucose levels were normal and remained well controlled with insulin throughout her pregnancy.
In contrast to Dr. Bruner, defendants’ experts had substantial experience in general obstetrics, and had delivered a significantly greater number of babies. Moreover, defendants’ experts disagreed with Dr. Bruner’s opinion on almost every point. In particular, defendants’ experts testified that the applicable standard of care in this ease was to attempt a vaginal delivery, and that a c-section was not indicated for Mrs. Descant.
ligDr. Cohen, a board certified obstetrician/gynecologist in the New Orleans area since 1972, testified that the standard of care was to attempt a vaginal delivery if it was reasonable. Dr. Cohen opined that Dr. Herrera made every effort to get the most accurate estimated fetal weight he could get in this ease. There was no reason for Dr. Herrera to recheck the fetal weight on November 1, 1989, in light of the fetal weight obtained from the October 20, 1989 ultrasound, which estimated a fetal weight between 3,327 grams and 3,526 grams; about 7 pounds and 5 ounces. Dr. Cohen explained that an estimated fetal weight based on a November 1, 1989 ultrasound would have been more viable and more difficult to assess than an October 20, 1989 because both Mrs. Descant and the fetus would have been bigger. Dr. Cohen confirmed that it was reasonable for Dr. Herrera to believe Mrs. Descant’s baby weighed about 9 pounds on November 2,1989.
Dr. Cohen also opined that it was reasonable for Dr. Herrera to recommend to Mrs. Descant a serial induction and vaginal delivery on November 2, 1989. Dr. Cohen would not have recommended a e-section because there was no indication for a c-section at that point. Dr. Cohen testified that the serial induction and delivery was performed in a timely and reasonable fashion. Dr. Cohen testified that Dr. Herrera’s use of forceps was appropriate and that there was no merit to Dr. Bruner’s complaints about Dr. Herrera’s care of Mrs. Descant.
Dr. Farris, a board certified obstetrician/gynecologist practicing in New Orleans since 1955 and having delivered about 15,000 babies during this 40 year period, testified that Mrs. Descant was adequately and properly monitored throughout the prenatal period, and that an attempted vaginal delivery was the appropriate standard, given that: (1) Mrs. Descant has a “gynecoid” pelvis — an | ^“excellent” and preferred type of pelvis for vaginal deliveries; (2) Mrs. Descant had pre.viously delivered a baby weighing over 9 pounds; (3) estimated fetal weights by fundal height measurements and Leopold’s maneuvers have tremendous variability in an obese patient; (4) shoulder dystocia is not predictable and occurs 50% of the time in babies that way less than 4,000 grams (about 8.8 pounds); and (5) babies, of 12 and 14 pounds can be delivered vaginally without complications or shoulder dystocia.
Dr. Farris was “shocked at some of the things [Dr. Bruner] said.” Dr. Farris disagreed with Dr. Bruner’s opinions regarding the use of forceps and questioned Dr. Bruner’s experience with “the actual delivery mechanism.” Dr. Farris offered no criticisms of the manner in which Dr. Herrera handled the case, despite its unfortunate results.
Dr. Gabert, a board certified obstetrician/gynecologist since 1967 with a subspe-cialty in perinatology/maternal fetal medicine since 1977, testified that few obstetrician/gy-neeologists would do a c-section in the absence of a trial of labor. Dr. Gabert disagreed with Dr. Bruner’s opinion that babies of diabetic mothers grow asymmetrically and opined that babies of diabetic mothers grow proportionately. Dr. Gabert also disagreed that the October 20,1989, ultrasound showed *630 that the head and shoulders were growing disproportionately. • Dr. Gabert testified that Dr. Herrera’s estimated fetal weight of nine pounds on November 2,1989 was reasonable. Dr. Gabert testified that the fact that Mrs. Descant’s second stage of labor lasted for a little more than an hour did not increase the risk of shoulder dystocia. Dr. Gabert stated that the health care services Dr. Herrera provided to Mrs. Descant were reasonable, appropriate and complied with all prevailing standards of care.
120Dr. Cunningham, a board certified obstetrician/gynecologist since 1974 with a subspe-cialty in perinatology/maternal fetal medicine and the Chief of Obstetrics and Gynecology at Parkland Hospital in Dallas, Texas since 1982, testified that Dr. Herrera acted reasonably in estimating a fetal weight of about nine pounds at the time of delivery. Dr. Cunningham opined that he found no problems with the care Mrs. Descant received in the labor and delivery unit or in the delivery room. Dr. Cunningham testified that Dr. Herrera’s management of the shoulder dys-tocia, use of the McRoberts maneuver, and use of suprapubic pressure was all appropriate. Dr. Cunningham testified that shoulder dystocia is an unanticipated unforeseeable event, and can occur with any baby that weighs more than 6 pounds. Dr. Cunningham agreed that Dr. Herrera did not violate any standard of care by taking Mrs. Descant to serial • induction with vaginal delivery,whether he estimated the fetal weight at nine pounds or nine and 3/4 pounds. Dr. Cunningham testified that there was nothing that would have indicated that Dr. Herrera should have done a c-section on Mrs. Descant, and that he did not believe that Dr. Herrera failed to comply with the prevailing standards of care on any issue.
The jury’s finding that plaintiffs failed to prove the applicable standard of care was a reasonable determination based on the record. The jury apparently rejected the testimony of plaintiffs’ expert, Dr. Bruner, and found defendants’ experts more credible. Accordingly, we affirm the jury’s verdict in favor of Dr. Herrera.
4. ASSIGNMENT OF ERROR NO. 4: Whether the trial court manifestly erred in instructing the jury regarding the standard of care' and liability in a medical malpractice case?
We agree with Plaintiffs’ contention that the trial court overemphasized plaintiffs’ burden of proof by redundant repetition of their burden, however we doj^not find that the trial court’s instructions were so manifestly prejudicial that the verdict in favor of Dr. Herrera should be reversed.
This Court must exercise “great restraint” before reversing a jury verdict on the grounds of erroneous jury instructions. The reason for this standard of review is because a losing party can usually find some deficiencies in the instructions to argue for a reversal. The question to be determined is whether the jury was misled to the extent that it was prevented from dispensing justice. Clark v. Jesuit High School of New Orleans, 96-1307 (La.App. 4 Cir. 12/27/96).
Although the trial' court’s instructions were unnecessarily repetitive, the instructions accurately reflect the law applicable to this medical malpractice case, including plaintiffs’ burden of proof under La.Rev.Stat. Ann. Sec. 9:2794. In fact, plaintiffs concede that the trial court correctly stated the plaintiffs’ burden of proof, and that the court’s instructions regarding medical malpractice are “individually correct statements of law.” Plaintiffs argue that manifest error exists in the court’s unnecessary repetition of the instructions. However, plaintiffs do not cite Louisiana law to support the contention that repetitive instructions, although correct statements of the law, constitute manifest error. Additionally, we do not find that the jury was misled to the extent that it was prevented from administering justice. Accordingly, we do not find that the trial court’s instructions warrant reversal.
5. ASSIGNMENT OF ERROR NO. 5: Whether the trial court’s Jury Instructions and Interrogatories regarding informed consent were manifestly erroneous.
Plaintiffs contend that the trial court erred in its instructions on informed consent and in *631 refusing to permit plaintiffs to argue that their consent was obtained by misrepresentation. Alternatively, plaintiffs argue that the jury’s verdict on ^informed consent was manifestly erroneous. We disagree. The trial court’s instructions accurately reflect the law on informed consent applicable to this case, and record supports the jury’s verdict that Dr. Herrera obtained Mrs. Descant’s informed consent to a vaginal delivery.
Specifically, the court instructed the jury as follows:
I must explain to you Louisiana law with respect to the doctrine of informed consent. This doctrine is based on- the principle that every human being of adult years and sound mind has a right to determine what shall or shall not be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit that patient herself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all and the risks of any alternative methods of treatment.
The doctor’s duty is to disclose all risks that are material. A risk is material when a reasonable person in what the doctor knows or should know to be the patient’s position would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.
To establish consent to a risk, it must be shown both that the patient was aware of the risk and that she consented to encounter it. Therefore, it is obvious that a risk must have been understandably communicated before the element of awareness can be established. A physician’s duty to disclose material information, including reasonable alternative therapy must be communicated in terms that a reasonable doctor would believe a reasonable patient in Mrs. Descant’s position would understand. Technical language should not be used to inform an untutored lay person in order for a reasonable patient to have awareness of a risk.
Plaintiffs have alleged that Dr. Herrera failed to provide them with sufficient information to consent to the procedure. To prove a lack of informed consent, the plaintiffs are required to show; one, that the adverse results of the procedure were known, significant and material risks which should have been disclosed. Two, that those risks were not disclosed. Three, that plaintiffs were unaware of those risks. Four, that a reasonable person would have refused the procedure because of the risk and five, injury caused by the failure to disclose. The physician’s duty is to disclose all risks that are material. The determination of materiality is a two part test which establishes an objective, reasonable standard to protect the physician from irrational decisions on the part of the patient. First, the existence and l^nature of the risk must be determined along with the likelihood of its occurrence. This is established through expert testimony. Second, the trier of fact must determine whether a reasonable person in plaintiffs condition would attach significance to that risk, considering the incident of the particular injury and the degree of harm. The probability of harm and the gravity of the harm are the first factors to consider in determining the significance and materiality of any potential risk. These factors are of a scientific nature and must be established by the testimony of competent physicians. If consent is found to be deficient, plaintiffs must prove that the failure to inform caused the damaging consequences. If plaintiffs would have undertaken the treatment in any event, in spite of the deficient informed consent, there can be no recovery. The test in determining causation is objective. Only when undisclosed risks would have induced a reasonable person in the plaintiffs condition to refuse treatment is there a causal connection between the physician’s failure to inform and the patient’s injury.
*632 A physician is not required to warn a patient of every conceivable possible risk that may stem from a particular procedure; nor is he required to inform the patient of an event that cannot be reasonably anticipated or of a very remote or rare possibility of complications. A physician has a legal obligation to inform the patient as to the particular material risk associated with the proposed medical treatment at the time the consent is sought. It is the doctor’s duty to inform the patient of the known material risks and the reasonable treatment alternatives. The physician is not required to disclose risks that are not reasonably foreseeable or not material. Risks that are commonly understood or obvious or already known to the patient need not be disclosed by the doctor. The failure to disclose a possible danger is not a breach of duty on the part of the physician in the absence of a showing that a reasonable person in plaintiffs position would not have given consent if he had been warned of the danger. Beeaúse of the likelihood of the plaintiffs bias in testifying in hindsight on this hypothetical matter, you should use an objective standard of causation. It is not whether plaintiff would have consented, but whether a reasonable person in plaintiffs position would have consented to the treatment or procedure had the material information and risks been disclosed. Louisiana Revised Statute, Title 40, Section 1299.4 provides in pertinent part: Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures together with the known risks, if any,- of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; (b) acknowledged that such disclosure of information has been made and that all questions asked about the procedure or procedures had been answered in a satisfactory manner and (c) it’s signed by the patient for whom the procedure is to be performed or if the patient for any reason lacks legal or capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be ^presumed to be valid and effective in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
Louisiana law provides that if a patient is proven to have signed a consent form, then that patient is presumed to have understood and consented to encounter such risks set forth in the consent form and the patient can only rebut this presumption by showing that her consent was induced by misrepresentation or inadequate disclosure.
Louisiana Statute Annotated, Revised Statute Title 40, Section 1299.40 requires that the nature and purpose together with the known risk of a medical or surgical procedure be disclosed to the patient who must then be afforded the opportunity to ask questions and must acknowledge in writing his consent to the treatment. When the form is signed, the patient is presumed to have understood and agreed to encounter whatever risks a reasonable person, in what the doctor knows or should have known to be the patient’s position would have apprehended from the written form. The statutory presumption of consent to encounter risks adequately described in the form is rebuttable by showing that the consent was induced by misrepresentation; that is, that it was uninformed.
A non-ease specific boiler plate form is not sufficient to qualify for the presumption of consent provided by Louisiana Revised Statute Title 40, 1299.40. There can be no presumption of consent where the consent form makes no mention of the risk at issue. A person who signs a written document is presumed to know its content and cannot claim that he did not read or understand the document. Informed consent may be verbal. Where the written consent form the patient signed provides that there can be no guarantee expressed or implied either as to the result of the treatment or as to the cure, evidence re *633 garding expressed or guaranteed results of treatment is inadmissible and should not be considered. If you find from a preponderance of the evidence that Dr. Herrera did not properly obtain Mrs. Descant’s informed consent, then you must consider whether there is a causal relationship between the doctor’s failure to disclose material information and the alleged harm suffered by the plaintiff. Accordingly, you must decide whether a reasonable patient in the plaintiffs position would have' consented to the treatment or procedure had the material information and risk been disclosed. If you find that Dr. Herrera did not properly obtain Mrs. Descant’s informed consent and that Mrs. Descant would not have consented if she had been properly informed of the risk, then you may find Dr. Herrera liable for the damages that were proximately caused by Mrs. Descant’s consenting to delivery by vaginal delivery.
After thoroughly reviewing the trial court’s instructions regarding plaintiffs’ burden of proving inadequate informed consent, we find that the trial court’s instructions accurately reflect the law on informed consent applicable to this case. We disagree with plaintiffs’ first contention that “[b]y instructing the jury that they Rgcould find the form presumptively valid, ‘notwithstanding any law to the contrary,’ the trial court erred.” Contrary to plaintiffs’ statement, the trial court did not instruct the jury in this manner. Rather, the court specifically stated that a non-case specific boiler plate form is not sufficient to qualify for the presumption of consent provided by La.Rev.Stat. Sec. 40:1299.40. As set forth above, the court specifically stated that, “there can be no presumption of consent where the consent form makes no mention of the risk at issue.”
With regard to plaintiffs’ second contention that the court erred in refusing to permit plaintiffs to argue that Mrs. Descant’s consent was obtained by misrepresentation, we find no evidence in the record to support this contention. Rather, the record is replete with plaintiffs’ evidence arguing that Mrs. Descant’s consent was obtained by misrepresentation. Additionally, the trial court specifically instructed the jury that “the statutory presumption of consent to encounter risks adequately described in the form is rebutta-ble by showing that the consent was induced by misrepresentation;, that is, that it was uninformed.”
Last, plaintiffs contend that even if the trial court’s instructions were not erroneous, this Court should find that the jury’s verdict on informed consent was manifestly erroneous. Specifically, plaintiffs assert that Dr. Herrera never informed them that the baby could get stuck in the birth canal, and that Dr. Herrera denied Mrs. Descant’s requests, during the course of her labor, for a e-section. To support these contentions, plaintiffs introduced the testimony of Mr. and Mrs. Descant. However, the Descant’s testimony presents inconsistencies and contradictions that a reasonable jury could find lacked credibility.
For example, at trial Mrs. Descant unsuccessfully attempted to deny that she signed the November 2, 1989 written consent for vaginal or c-section delivery, |26which contained her hand written consent “to deliver my baby through my vagina or through an incision on my abdomen.” Similarly, Mr. Descant lost credibility when he testified on direct examination that Mrs. Descant requested a c-section on several occasions during the course of her labor, but when impeached with his deposition testimony on cross-examination, Mr. Descant confessed that he did not “think she ever asked” for a c-section.
Plaintiffs even acknowledge in their appellate brief that “the jury could have premised its decision upon Dr. Herrera’s testimony,” which is probably what happened. According to Dr. Herrera, when Mrs. Descant found out she was pregnant, he counseled the couple about the risks associated with continuing the pregnancy. Additionally, on Mrs. Descant’s first clinic visit of April 13, 1989, Dr. Herrera testified that he and Mrs. Descant talked:
[Ajbout risks that she had for vaginal delivery and that the baby can get stuck.' We talked about a stillbirth. We talked about breech. We talked also at that point about injuries to the baby and stillbirth as *634 the death of the baby before it is born. We talked about' the low oxygen during delivery and may need to use forceps. We talked about the risk for caesarean section and vaginal delivery and in vaginal delivery, it was trauma to the rectum and bladder and to the vagina and all that area, there is the risk of infection, there is the risk of hemorrhage and we talked about C-section, about the risk of trauma to the intestines, to the bladder as you do a surgical procedure, that there is more risk of, for example, there was more risk that she may have an opening or the incision of her womb because of the big adipose tissue you have in somebody who is obese at 250 something pounds at the time that she delivered and she was already more than 200 pounds- at that time. Also because of the diabetes, the patient is more prone to get infections and more severe infections than if you were a normal person.
Dr. Herrera further testified that he explained the risks and consequences related to Mrs. Descant’s pregnancy “as we went along during the whole clinic time.”
On the morning of November 2, 1989, Dr. Herrera testified that he discussed the alternatives of vaginal and c-section delivery, and the risks of both ^procedures. Specifically, Dr. Herrera informed the Descants that vaginal delivery presented a 10% chance of risks to Mrs. Descant, including trauma to the birth cánal, bleeding and hemorrhage, pulmonary embolus, infection, paraplegia, and death, and a 20% chance of risks to the baby, including loss of function of an organ or limb such as Erb’s palsy, loss of oxygen, and brain damage. C-section delivery presented a 30-35% chance of risks to Mrs. Descant, including pulmonary embolus, trauma to internal organs and an increased risk of infection secondary to the incision, and a 5% chance of risks to the baby, including cutting the baby. Dr. Herrera testified that although he recommended an attempt at vaginal delivery, Mrs. Descant made the decision to proceed vaginally. Dr. Herrera specifically testified that “she never asked me to do a c-section at-any time.”
We affirm the jury’s finding that Dr. Herrera obtained Mrs. Descant’s informed consent to a vaginal-delivery, as such a finding is supported by the testimony and evidence in the record.
6. ASSIGNMENT OF ERROR NO. 6: Whether the trial court erred by refusing to instruct the jury that defendants had stipulated that plaintiffs’ damages equaled $500,000?
The trial court erred in refusing to instruct the jury that defendants had stipulated that plaintiffs’ damages equaled $500,-000, however we do not find that the trial court’s error was so manifestly prejudicial that the verdict in favor of Dr. Herrera should be reversed.
Specifically, this Court affirmed the trial court’s ruling that plaintiffs’ evidence regarding Edith Descant’s damages was irrelevant in light of defendants’ stipulation, Descant v. Administrators of the Tulane Educational Fund, No. 95-0751 (La.App. 4 Cir. 4/5/95), 653 So.2d 819. However, this Court did not rule as to whether the substance of the defendants’ stipulations would have to be 128Communicated in some form to the jury. 'Having considered this issue on appeal, we . find that the substance of the defendants’ stipulation should be communicated in some form to the jury- on remand as to TMC Hospital and Clime’s liability.
As set forth in the trial transcript, defendants stipulated to plaintiffs’ entitlement to the maximum amount of available damages if liability was found against any defendant, to which plaintiffs objected. Over plaintiffs’ objection that the Code requires all parties to consent to a stipulation, defendants recharac-terized their stipulation as an admission. Specifically, defendants’ counsel stated:
They have plead and they certainly don’t agree that the limitations of the Statute are binding on them. They certainly want to challenge that, but the law is the law, and the case law is the ease law and when I come in and admit that they are entitled to the maximum as provided by Statute and by the case law, whether you call it a stipulation or not, it is an admission on our part... And I don’t understand, if I admit they are entitled the maximum, if they are entitled, there is nothing that should *635 preclude me from going forward in making that stipulation that way.
Having recharacterized defendants’ stipulation as an admission, the court sustained defendants’ “stipulation,” thereby precluding the introduction of any evidence regarding damages. Pursuant to defendants’ admission:
[I]f the defendants are cast liable in this matter, that as to damages, Tulane and/or Dr. Herrera will be responsible for the first $100,000 and the Patients’ Compensation Fund will be responsible for the next $400,000; that $500,000 will be general damages and it would not be reduced by any payment of any medical benefits, that the issue of medical benefits would be above the $500,000. In addition, in that the future medical care of Edith Descant after today’s date is stipulated, she will need future medical care.
In remanding the issue of TMC Hospital and Clinic’s liability, we instruct the trial court to communicate in some form to the jury TMC Hospital and Clinic’s stipulation/judicial admission regarding damages. If TMC Hospital and Clinic is found liable on remand, plaintiffs are entitled to the maximum amount of damages legally available under the Medical Malpractice Act.
1297. ASSIGNMENT OF ERROR NO. 7: Whether the trial court erred by holding that plaintiffs were not entitled to a separate “cap” on damages with respect to their individual claims for damages?
The trial court properly found that Mr. and Mrs. Descant failed to allege an individual cause of action on their own behalf, and were therefore not entitled to a separate “cap” on damages with respect to their individual claims for damages.
Plaintiffs erroneously rely on the First Circuit’s ruling in Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000, 1013 (La.App. 1 Cir.), writ denied, 434 So.2d 1093 (La.1983), which involved an obstetrical malpractice case where the child was entitled to an award for the maximum of $500,000 and the mother was entitled to an additional award of $25,000, as support for this case.
Contrary to plaintiffs’ contention that Williams is “a case on all fours with this one,” the facts in Williams are distinguishable from the facts here. Significantly, the mother in Williams pled damages suffered by her individually as a result of the physicians’ failure to obtain her informed consent, the failure of which gives rise to liability even in the absence of negligence. Her testimony was not contested, but rather corroborated by the absence of a written consent form in her file. Having been deprived of this opportunity to exercise informed consent, the Court found that Ms. Williams has suffered damages in her own right.
Here, the Descants do not plead individual damages, nor do they establish liability separate from the alleged malpractice resulting in Edith Descant’s injuries. Although the Descants challenge the sufficiency of the informed consent they agreed to in writing, which the jury found without merit, this alone does not establish a separate cause of action. Accordingly, the trial court did not err in holding that plaintiffs were not entitled to a separate “cap” on damages with respect to their individual claims for damages.
lao8. ASSIGNMENT OF ERROR NO. 8: Whether plaintiffs’ assignment of error regarding the unconstitutionality of the Louisiana Medical Malpractice Act’s provisions regarding payment of future medical expenses as they accrue is timely and procedurally correct?
Plaintiffs contend that the trial court permitted defendants, via their stipulation regarding damages, to manipulate the medical Malpractice Act’s limitation of liability to deny plaintiffs their constitutional rights to “due process,” “adequate remedy,” and “equal protection.” Plaintiffs also argue that the Medical Malpractice Act’s provisions regarding the payment of future medical expenses as they accrue is “a denial of equal protection and unconstitutional.”
As a preliminary matter, the constitutionality of a statute must, first be alleged in the trial court, and the alleged unconstitutionality must be specifically pled to be considered by the trial court. Vallo v. Gayle Oil Co., Inc., 94-1238 (La.11/30/94), *636 646 So.2d 859. Additionally, the Louisiana Attorney General must be served a copy of the pleading which contests the constitutionality of a statute. Id. at 864. Here, plaintiffs did not plead the unconstitutionality of the Medical Malpractice Act with regard to future medical expenses, nor did plaintiffs serve a copy of any pleading or memo on the Louisiana Attorney General or otherwise provide that office with notice that the constitutionality of the Medical Malpractice Act was being raised on this appeal.
In addition to plaintiffs’ procedural defects, defendants’ stipulation that “in the event final judgment is rendered against the defendant on liability issues, that regarding the element of damages that relates to future medical expenses as defined under the Statute, that Edith Marie Descant is in need of future medical care” does not prejudice the plaintiffs. Once health care providers admit that, in event of their liability, a patient is in need of future medical care and related benefits, the issue of amount of future medical care and related benefits is no longer relevant hibecause the issue falls within the exclusive original jurisdiction of the Patient’s Compensation Fund and Oversight Board. La.R.S. 40:1299.48, subds. A, C, E(2), G(5); 40:1299.44, subd. A(2-4, 7); Kelty v. Brumfield, 633 So.2d 1210 (La.1994). Accordingly, plaintiffs recovery for future medical and related care claims can still be sought directly from the Patient’s Compensation Fund and Oversight Board.
CONCLUSION
We affirm the jury’s verdict in favor of Dr. Herrera and reverse and remand the trial court’s directed verdict in favor of TMC Hospital and Clinic. The jury’s findings in light of the testimony and evidence in the record as to Dr. Herrera’s liability, including its ■ determinations based on credibility, are reasonable.
However, we do find that plaintiff presented sufficient evidence to preclude the directed verdict which dismissed her claim against TMC Hospital and Clinic. At that point in the trial, reasonable persons could find TMC Hospital and Clinic liable.
Accordingly, we affirm the jury’s verdict as it pertains to Dr. Herrera and remand the issue of liability against TMC Hospital and Clinic.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
MURRAY, J., concurs.
LOB RANO, J., dissents in part.